SEYFARTH SHAW LLP
Kristina M. Launey (SBN 221335)
klauney@seyfarth.com
400 Capitol Mall, Suite 2350
Sacramento, California 95814-4428
Telephone:     (916) 448-0159
Facsimile:     (916) 558-4839

Eden Anderson (SBN 233464)
eanderson@seyfarth.com
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone:     (415) 397-2823
Facsimile:     (415) 397-8549

Attorneys for Defendants
AUTOMATIC DATA PROCESSING, INC. and ADP
TOTALSOURCE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIGHTHOUSE FOR THE BLIND AND VISUALLY IMPAIRED OF SAN FRANCISCO, a California non-profit corporation; and ERIN LAURIDSEN and FRANK WELTE, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>AUTOMATIC DATA PROCESSING, INC., a Delaware corporation; ADP TOTALSOURCE, INC., a Florida corporation; and DOES 1-5,<br><br>Defendants. | Case No. _____<br><br>**NOTICE OF REMOVAL**<br><br>(San Francisco Superior Court No. CGC-20-586626)<br><br>Complaint Filed:   September 17, 2020 |

**TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA AND TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Defendants Automatic Data Processing, Inc. and ADP TotalSource, Inc. (together "Defendants"), hereby remove the above-referenced action from the Superior Court of the State of California for the County of San Francisco to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. §§ 1441 and 1446, asserting original federal jurisdiction on the basis of diversity, codified in relevant part at 28 U.S.C. § 1332.  Defendants state that removal is proper for the following reasons:

## I.    PROCEEDINGS IN STATE COURT

1.    On September 17, 2020, a verified Complex Case Complaint ("Complaint") was filed on behalf of LightHouse for the Blind and Visually Impaired of San Francisco ("LightHouse"), Erin Lauridsen ("Lauridsen"), and Frank Welte ("Welte") (collectively "Plaintiffs"), in the Superior Court of the State of California, County of San Francisco entitled, "*LIGHTHOUSE FOR THE BLIND AND VISUALLY IMPAIRED OF SAN FRANCISCO, a California non-profit corporation; and ERIN LAURIDSEN and FRANK WELTE, individuals, v. AUTOMATIC DATA PROCESSING INC., a Delaware corporation; ADP TOTALSOURCE, INC., a Florida corporation; and DOES 1-5, Defendants*, and designated Case No. CGC-20-586626 ("Superior Court Action").

2.    The Complaint alleges claims for: (1) Violation of Civil Code § 51; (2) Violation of Civil Code § 51.5; and (3) Unfair and Unlawful Business Practices (Bus. & Prof. Code § 17200).  A true and correct copy of the Complaint is attached hereto as Exhibit 1.

3.    Defendants both accepted service of the Summons and Complaint on November 16, 2020.  A copy of the Summons and its accompanying documents (*i.e.*, Civil Case Cover Sheet, Notice and Acknowledgment of Receipt, ADR Information Packet, and Notice to Plaintiff setting Case Management Conference), Proof of Service of Summons, and signed Notice and Acknowledgment of Receipt are attached hereto as Exhibit 2.

4.    Exhibits 1-2 constitute all the process, pleadings, and orders served on any party in the Superior Court Action.

## II.    TIMELINESS OF REMOVAL

5.    This Notice of Removal is being filed within thirty (30) days of November 16, 2020, the date Defendants executed the Notice and Acknowledgment of Receipt of the Summons and Complaint and within one (1) year of the commencement of the action.  Thus, removal is timely pursuant to 28 U.S.C. § 1446(b) and Federal Rule of Civil Procedure 6(a).  (*See Destfino v. Reiswig*, 630 F.3d 952, 956 (9th Cir. 2011) (If the initially served defendant chooses to remove within the 30-day window from service, it may do so (and obtain the joinder of all defendants who have been served as of that time; 28 U.S.C. § 1446(b)(2)(B).)  All Defendants are filing this Notice of Removal and all Defendants join in seeking removal of this action.

## III.    DIVERSITY OF CITIZENSHIP JURISDICTION

6.    This action may be properly removed on the basis of diversity of citizenship jurisdiction, in that it is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  (28 U.S.C. §§ 1332(a)(1), 1441(a).)

### A.    Plaintiffs' Citizenship

7.    Pursuant to 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of any State . . . by which it has been incorporated and of the State . . . where it has its principal place of business."  The United States Supreme Court's decision in *The Hertz Corp. v. Friend*, 559 U.S. 77, 130 S.Ct. 1181 (2010) clarified the meaning of § 1332(c)(1).  Specifically, the Supreme Court held that a corporation's "principal place of business" for determining its citizenship is the corporation's "nerve center":

> We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities.  It is the place that Courts of Appeals have called the corporation's "nerve center."  And in practice it should normally be the place where the corporation maintains its headquarters -- provided that the headquarters is the actual center of direction, control, and coordination, i.e., the "nerve center" ….

*Id*. at 1192.

8.      LightHouse is a non-profit corporation incorporated under the laws of the State of California with its principal place of business in San Francisco.  (Ex. 1, Complaint at caption and ¶ 11.)  Therefore, LightHouse is a citizen of the State of California.

9.      To establish citizenship for diversity purposes, a natural person must be both: (a) a citizen of the United States; and (b) a domiciliary of one particular state.  (*See Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983).)  A party's residence is *prima facie* evidence of his or her domicile.  (*State Farm Mut. Auto Ins. Co. v. Dyer*, 29 F.3d 514, 520 (10th Cir. 1994)).  Plaintiffs Lauridsen and Welte work and reside in California and are and were at the institution of this civil action citizens of the State of California.  (*See* Ex. 1, Complaint ¶¶ 12-13.)

**B.      Defendants' Citizenship**

10.     Defendant Automatic Data Processing, Inc. is now, and at all relevant times was, incorporated under the laws of the State of Delaware.  (Ex. 1, Complaint at ¶ 14.)  Automatic Data Processing, Inc.'s principal place of business is in Roseland, New Jersey, which is where its corporate headquarters and executive offices are located and where its high-level officers direct, control, and coordinate its activities.  Therefore, Automatic Data Processing, Inc. is not a citizen of the State of California.

11.     Defendant ADP TotalSource, Inc. is now, and at all relevant times was, incorporated under the laws of the State of Florida.  (Ex. 1, Complaint at ¶ 15.)  ADP TotalSource, Inc.'s principal place of business is in Miami, Florida, which is where its corporate headquarters and executive offices are located and where its high-level officers direct, control, and coordinate its activities.  Therefore, Defendant ADP TotalSource, Inc. is not a citizen of the State of California.

**C.      Doe Defendants' Citizenship**

12.     The presence of Doe defendants in this case has no bearing on diversity of citizenship for removal.  (28 U.S.C. § 1441(a) ("For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded."); *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1213 (9th Cir. 1980) (unnamed defendants are not required to join in a removal petition).  Thus, the existence of Doe defendants one through five does not deprive this Court of jurisdiction.

## IV.   AMOUNT IN CONTROVERSY

### A.   Plaintiffs' Allegations and the LightHouse/ADP TotalSource, Inc. Agreement

13.     LightHouse employs over 100 people, around 55 of whom are blind or have low vision. (Complaint ¶¶ 1, 24.)  ADP TotalSource, Inc. (hereinafter "ADP") is a professional employer organization ("PEO") and provides associated products and services to clients.  (Complaint ¶ 20.)  In September 2017, LightHouse and ADP executed a Client Services Agreement ("Agreement"). (Complaint ¶¶ 2, 23.)

14.     Under the Agreement, ADP committed to providing LightHouse the following products and services: payroll and tax filing; unemployment claims administration; human resources services and products (through a secure human resources website); human resources guidance; leave administration, an employee telephonic service center; an employee assistance program; EEO-1 Filing; workplace safety guidance; workers' compensation claims administration; certain managerial and employee training programs; and benefits administration.  Pursuant to the Agreement, LightHouse pays a "Service Fee" to ADP for the foregoing products and services.  The Service Fee is based on a percentage of the gross payroll total for certain of LightHouse's employees.  The total annual gross payroll for LightHouse's employees, upon which the Service Fee is calculated, is over $5.5 million.

15.     In addition to the products and services set forth above, the Agreement also provides that, at LightHouse's election, it can pay additional fees to have access to Time and Labor Management, an ADP product which assists LightHouse in tracking its employees' hours worked, provides a time and attendance program, and time labor reporting.

16.     Under the Agreement, between 2017-2020, LightHouse has paid well over $500,000 in total fees to ADP.

17.     LightHouse's employees use ADP's web and application based products to, among other things, punch in and out to record their hours worked, make benefits elections, list and maintain emergency contact information, access pay, tax, and direct deposit information, and view annual holidays.  (Complaint ¶ 21.)  Managerial employees use ADP's products to, among other things, approve time off requests, review and correct timesheets, for employee onboarding, hiring, workers' compensation, and tracking company property.  (Complaint ¶ 22.)

18.     LightHouse alleges that the web and mobile application based products that it contracted for are not accessible to its visually impaired employees.  (Complaint ¶¶ 3-4.)  Given the products' inaccessibility, LightHouse's visually impaired employees "cannot independently" "submit[] and aprov[e] time off requests"; "view[] tax, compensation and benefits information"; and log and approve hours worked.  (Complaint ¶ 4.)

19.     According to LightHouse, "ADP's failure to make its products . . . accessible to [visually impaired] individuals who use assistive devices has rendered those products and services all but unusable."  (Complaint ¶ 43.)  Indeed, LightHouse has been "fully denied access to the privileges and services of ADP's product[s]."  (Complaint ¶ 9.)

20.     In addition to paying for "unusable" products, LightHouse alleges it has also suffered other losses because its employees—both visually impaired and sighted—are not as productive.  The approximately 55 visually impaired employees all allegedly suffer productivity losses as described in the following paragraphs.

21.     "The product's inaccessibility prevents managers from doing their jobs and causes LightHouse to have to overstaff certain roles as a result; and managers, non-managers, and administrative staff are all forced to waste valuable time and resources to accomplish basic HR functions."  (Complaint ¶ 4.)  "[T]hese barriers [to product accessibility] significantly extend the amount of time it takes for staff to complete simple tasks."  (Complaint ¶ 26.)  "Accessibility barriers have multiplied the amount of time that LightHouse staff must spend on basic payroll and human resources tasks."  (Complaint ¶ 43.)  Visually impaired employees are "unable to, or spend unreasonable amounts of time to, perform basic tasks like logging or reviewing hours [worked] or requesting or approving time off."  (Complaint ¶¶ 7, 9.)

22.     "LightHouse employees who use screen readers cannot reliably use [the products] to clock in and out of work."  (Complaint ¶ 44.)  Thus, employees must "spend additional time reviewing their time sheets and contacting their supervisor and sighted staff in the finance department to make manual adjustments to correct issues."  (*Id.*)  This cuts into the "time to perform their substantive work tasks, reduces their focus by creating frustration, and can result in incorrect payments being issued to them for their hourly work."  (Complaint ¶ 44.)

DEFENDANTS' NOTICE OF REMOVAL

23.     Supervisorial employees with visual impairments suffer productivity losses because they cannot access the products to review and approve timesheets, and time off requests and balances. (*E.g.*, Complaint ¶ 53.) "[I]f there are errors on a supervisee['s] timesheet that are not discovered during the pay period, [a supervisor] must review every single time stamp entry in order to find the missing punch in or out on the timesheet." (Complaint ¶¶ 54-55.)

24.     LightHouse alleges its sighted employees also suffer productivity losses. "[B]arriers in ADP's products mean screen reader users must rely on sighted colleagues to access sensitive and private information related to their employment and compensation." (Complaint ¶ 43.) Because they cannot properly record their hours worked given accessibility problems, employees with visual impairments at times send their work hours to their supervisor, who then must "spend[] additional time entering the employee's hours." (Complaint ¶ 44.)

25.     LightHouse's sighted Director of Finance also allegedly loses productivity. He "receives approximately ten requests per pay period from hourly employees to fix time punches that were entered incorrectly because of the inaccessibility of ADP's app and website." (Complaint ¶ 45.) "The finance director must manually fix each error and document their entry into the system to do so. The finance director also reviews and approves approximately twenty employee time sheets on behalf of their direct supervisors who are blind or low vision who are unable to do so themselves . . . . This often requires individual follow-up with those twenty employees regarding irregularities in their timecards . . .. Similarly the finance director spends excessive time printing, scanning, and sending W2s to employees who are unable to access them . . .." (Complaint ¶ 45.)

26.     When employees with visual impairments rely on their sighted colleagues to access compensation and benefits information, in addition to productivity and efficiency loss, their privacy is also compromised. (Complaint ¶ 46.) "For example, for the past three years, during open enrollment LightHouse Staff have had to compromise their privacy and rely on assistance from their sighted colleagues or ADP representatives in order to make personal and private decisions about their benefits and compensation . . . ." (Complaint ¶¶ 4, 9.)

27.     The COVID-19 pandemic has "exacerbated the impact of the functional unavailability of [the products] . . .." (Complaint ¶ 47.)

28.     Both Plaintiffs Lauridsen and Welte have been employees of LightHouse throughout the entire period that LightHouse has contracted with ADP.  (Complaint ¶¶ 12-13.)

29.     Lauridsen is LightHouse's Director of Access Technology.  (Complaint ¶¶ 12, 49.)  She has a visual impairment.  (*Id.*)  Lauridsen alleges that she has been unable to use ADP's products "to perform necessary tasks related to her own employment as well as in her role as a manager.  She has been unable to update her emergency contact information; view and approve her supervisees' time off requests; or review and approve supervisee timesheets . . . ."  (Complaint ¶ 51.)  Additionally, the inaccessibility of ADP's products has made her less efficient in her work performance.  (Complaint ¶¶ 53, 55.)  Because Lauridsen cannot independently perform her supervisorial duty to  correct employees' timesheets, she must instead ask LightHouse's finance director to do so.  (Complaint ¶ 54.)

30.     Additionally, Lauridsen has been "unable to participate independently in open enrollment" in 2018, 2019, and 2020.  (Complaint ¶ 52.)  Consequently, she failed to timely make benefits elections and was "enrolled in default options."  (*Id.*)

31.     Welte is LightHouse's Senior Accessible Media and Braille Specialist.  (Complaint ¶ 13.)  He also has a visual impairment.  (Complaint ¶ 57.)  Because of the inaccessibility of ADP's products, Welte has been "unable to . . . perform tasks necessary to his employment, including selecting benefits or requesting time off, viewing personal financial or tax information, and viewing time off balances" and "unable to participate independently in open enrollment."  (Complaint ¶¶ 59-61.)

**B.     Available Remedies and Plaintiffs' Prayer for Relief**

32.     If Plaintiffs prevail on their claims under the Unruh Civil Rights Act, California Civil Code §§ 51 and 51.5 ("Unruh Act"), the following remedies are available to each:  "actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage, but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto . . . ."  (Civil Code § 52.)  Thus, each of the three Plaintiffs potentially could recover trebled actual damages and attorneys' fees.

33.     If Plaintiffs' prevail on their claim under California's Business and Professions Code § 17200 *et. seq.* ("UCL"), available relief is "generally limited to injunctive relief and restitution."  (*Korea Supply Co. v. Lockheed Martin* Corp., 29 Cal.4th 1134, 1144 (2003).)  "[I]f a plaintiff prevails in an

1   unfair competition law claim, it may seek attorney fees as a private attorney general pursuant to Code of

2   Civil Procedure section 1021.5."  (*Walker v. Countrywide Home Loans, Inc.*, 98 Cal.App.4th 1158, 1179

3   (2002).)

4          34.    Plaintiffs' Prayer for Relief seeks all of these remedies.  (Complaint at p. 29.)  The statute

5   of limitations on claims under the Unruh Act is two years.  The statute of limitations on a UCL claim is

6   four years.  (Gatto *v. County of Sonoma*, 98 Cal. App. 4th 744, 754-60 (2002) (two year limitations

7   period on Unruh Act claims); Bus. & Prof. Code § 17208.)

8          35.    Plaintiffs' Prayer for Relief also includes a demand for declaratory and injunctive relief.

9   Specifically, Plaintiffs seek an "order and finding that ADP's acts and practices . . . are unlawful and

10  unfair" and an "order requiring ADP comply with state law and provide full and equal independent

11  access to its website and mobile application for people who are blind and have low vision and/or who

12  use screen reader technology."  (Complaint at p. 29.)

### C.    With or Without Aggregation, the $75,000 Jurisdictional Threshold Is Met

14         36.    As a general rule, the claims of multiple plaintiffs may not be aggregated to meet the

15  amount in controversy required for federal jurisdiction.  (*Troy Bank of Troy, Ind., v. G.A. Whitehead &*

16  *Co.*, 222 U.S. 39, 40 (1911) ("When two or more plaintiffs, having separate and distinct demands, unite

17  for convenience and economy in a single suit, it is essential that the demand of each be of the requisite

18  jurisdictional amount"); *Gibson v. Chrysler Corp.*, 261 F.3d 927, 943 (9th Cir. 2001).)  An exception to

19  this rule exists, however, "when several plaintiffs unite to enforce a single title or right, in which they

20  have a common and undivided interest."  (*Id.* at 41.)  In such a case, it is enough that the plaintiffs'

21  interests collectively meet the jurisdictional minimum.  (*Id.*)  Whether a claim is common and undivided

22  does not turn on the commonality of the law or facts presented; rather, it is the nature of the underlying

23  claim itself that must be examined.  (*Potrero Hill Comty. Action Comm. v. Hous. Auth. of S.F.*, 410 F.2d

24  974, 977–78 (9th Cir. 1969).)  The Ninth Circuit has stated that "the character of the interest asserted

25  depends on the source of plaintiffs' claims.  If the claims are derived from rights that they hold in group

26  status, then the claims are common and undivided.  If not, the claims are separate and distinct."  (*Eagle*

27  *v. Am. Tel. & Tel. Co.*, 769 F.2d 541, 546 (9th Cir. 1985).)  A claim is "common and undivided" when

28

the plaintiffs cannot bring their claims without involving one another. (*Gibson v. Chrysler Corp.*, 261 F.3d 927, 944, 946 (9th Cir. 2001).)

37.     Plaintiffs' claims here all derive from a common source, *i.e.*, the alleged inaccessibility of products purchased under the Agreement. Plaintiffs could not bring their claims without involving one another. Indeed, the claims of Lauridsen and Welte are tied to their employer LightHouse's contractual relationship with ADP. As such, Plaintiffs' claims should be aggregated in determining the amount in controversy. However, even if not aggregated, the amount in controversy is satisfied as to each Plaintiff alone, as set forth *infra*. Moreover, in an action involving multiple plaintiffs, a federal court may exercise supplemental jurisdiction over a co-plaintiff's claims that fail to meet the jurisdictional amount in controversy if (1) at least one plaintiff satisfies the amount in controversy, (2) the other elements of diversity jurisdiction are satisfied, and (3) the plaintiff's claims are part of the same "case or controversy." (*See Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 549 (2005) ("We hold that, where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies the amount-in-controversy requirement, § 1367 does authorize supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the jurisdictional amount specified in the statute setting forth the requirements for diversity jurisdiction.").)

**D.     General Principles**

38.     While Defendants deny any liability on Plaintiffs' claims, the amount in controversy requirement is satisfied because "it is more likely than not" that the amount exceeds the jurisdictional minimum of $75,000 either in the aggregate or per Plaintiff, as set forth in the analysis below. (*See Sanchez v. Monumental Life Ins.*, 102 F.3d 398, 404 (9th Cir. 1996) ("[D]efendant must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds [the threshold] amount.").) The jurisdictional amount may be determined from the face of the complaint. (*Singer v. State Farm Mutual Automobile Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997).) However, as explained by the Ninth Circuit, "the amount-in-controversy inquiry in the removal context is not confined to the face of the complaint." (*Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (finding that the Court may consider facts presented in the removal petition).)

39.     In determining whether a complaint meets the $75,000 threshold of 28 U.S.C. § 1332(a), a court may consider the value of claims for compensatory and punitive damages, as well as attorneys' fees.  (*See, e.g.*, *Bell v. Preferred Life Ass. Soc'y*, 320 U.S. 238, 240 (1943) ("Where both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining jurisdictional amount.") (footnote omitted); *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir. 1982) cert. denied, 459 U.S. 945 (1982) (attorneys' fees may be taken into account to determine jurisdictional amount).)

40.     Emotional distress damages may also be considered when calculating the amount in controversy, even where not clearly pled in the complaint.  (*Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1034 (N.D. Cal. 2002); *Richmond v. Allstate Ins. Co.*, 897 F. Supp. 447, 450 (S.D. Cal. 1995) ("the vagueness of plaintiffs' pleadings with regard to emotional distress damages should not preclude this Court from noting that these damages are potentially substantial").)

### E.     Amount in Controversy Calculations

#### 1.     Plaintiff LightHouse

##### a.     Actual Damages Under the Unruh Act

41.     LightHouse's actual damages include not receiving the "full value" of the products it purchased and also the lost "value of staff time spent working around the inaccessibility of the product it pays for."  (Complaint ¶ 98.)

###### i.     Damages (or Restitution) for "Unusable" Products

42.     As to LightHouse's prayer for restitution, it seek "the amount of the difference between what LightHouse paid for ADP's product[s] and the value it actually obtained."  (*Id.*)  Plaintiffs would arguably also be entitled to recover this amount as damages under the Unruh Act.  The total amount paid under the Agreement dating back to the first provision of products in October 2017 is well in excess of $500,000.  Although the fees paid were for a variety of products and services, and not just those that Plaintiffs allege are inaccessible, assuming just 10% of the fees paid are attributable to unusable products, that equates well over $50,000.

### ii. Damages for Lost Productivity of 55 Visually Impaired Employees

43.    The total annual gross payroll for LightHouse's employees, upon which the Service Fee is calculated, is over $5.5 million. Fifty-five percent of LightHouse's 100 employees are visually impaired, and thus gross payroll for these individuals is reasonably estimated to exceed $3 million. Assuming each such employee lost just 1% of their productivity each year due to the inaccessibility of ADP's products—a reasonable inference based on the above allegations—that would translate to a loss of $30,000 annually, or $60,000 during the two year limitations period applicable to the Unruh Act claims. Of course, recovery of both (a) the above-noted contract damages, as well as (b) for lost employee productivity, would be excessive, but the Complaint seeks to recover both, which is what matters in determining the amount in controversy.

### iii. Damages for Lost Productivity of Sighted Employees

44.    As to the remaining approximately 45 sighted employees, LightHouse alleges that its supervisorial employees, as well as the Director of Finance, have also lost productivity. The Director of Finance's lost productivity, as set forth in Paragraph 45 of the Complaint, appears substantial. Assuming an annual salary of $100,000, and a 3% annual productivity loss for the Director of Finance, that would translate to $6,000 in lost value of the Director of Finance's time during over the two year statutory period. This figure does not include amounts attributable to lost productivity of sighted supervisorial employees.

45.    In sum, LightHouse seeks to recover damages that exceed the $75,000 jurisdictional minimum.

### b. The Value of Declaratory and Injunctive Relief

46.    In actions seeking declaratory relief or injunctive relief, the amount in controversy is measured by the value of the object of the litigation. (*Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 347 (1977).) Here, that value can be measured by the costs that ADP will incur in having to comply with Plaintiffs' requested injunction. (*See, e.g., Simmons v. PCR Technology,* 209 F.Supp.2d 1029, 1034 (N.D. Cal. 2002) ("Plaintiff seeks an injunction commanding reinstatement to his former

1    position. The amount in controversy may include the cost of complying with such an injunction.");

2    *Stelzer v. CarMax Auto Superstores Cal.*, LLC, 2013 WL 6795615, at *5 (S.D. Cal. 2013) (same).

3         47.    Here, Plaintiffs ask for an injunction requiring ADP to make all its products accessible to

4    all its clients.  While doubtful Plaintiffs could obtain such broad relief, the cost of compliance for just

5    making products fully accessible to LightHouse employees is estimated to be well in excess of $100,000.

6                        **c.    Attorneys' Fees**

7         48.    As the Complaint alleges, the parties engaged in structured negotiations between October

8    2018 and April 2020 in an effort to resolve this dispute before Plaintiffs commenced litigation.

9    (Complaint ¶¶ 67-68.)  Thus, at this juncture, sizeable attorneys' fees have already been incurred.  Fee

10   awards in similar disability access cases establish that, if the case is litigated and if Plaintiffs' prevailed,

11   a fee recovery could be sizeable.  (*Rivera v. Crema Coffee Company LLC*, 2020 WL 4701131, at *8

12   (N.D. Cal. 2020) (in Unruh Act disability access case involving inaccessible facilities, granting

13   plaintiffs' motion for attorneys' fees in the amount of, awarding $68,650.88 in attorney's fees);

14   *Hernandez v. Lucky Fortune, Inc.*, 2018 WL 317841, at *4 (N.D. Cal. 2018) (same, and awarding

15   plaintiff $98,005 in attorneys' fees); *Rodriguez v. Barrita, Inc.*, 53 F.Supp.3d 1268, 1296 (N.D. Cal.

16   2014) (same and awarding plaintiff $584,805.60 in attorneys' fees).)

17                   **2.    Lauridsen and Welte**

18               **a.    Damages for Intentional Discrimination**

19        49.    While both Lauridsen and Welte allege they have suffered "intentional discrimination" in

20   their capacity as employees of LightHouse and that their work performance has been adversely

21   impacted, they do not allege employment related claims for disability discrimination, failure to

22   accommodate, or failure to engage in the interactive process against their employer LightHouse. They

23   instead seek to hold Defendants liable under the Unruh Act.  The claims that Lauridsen and Welte allege

24   are best analogized to those more traditionally asserted in the employment context under the Fair

25   Employment and Housing Act ("FEHA").  Indeed, Plaintiffs allege that the performance of their jobs

26   has been impaired because the systems they use to perform their duties have not been accessible to them,

27   and that they are not as productive, must seek assistance from their sighted colleagues, and have suffered

28

---

13

frustration and privacy violations as a result. Whether looking at jury verdicts under the FEHA, or under the Unruh Act, it is clear a damages award could be sizeable.

50.     Without any admission that Plaintiffs could prevail on their claims, it is appropriate to consider jury verdicts in cases with similar claims when determining the amount in controversy. (*Simmons*, *supra*, 209 F. Supp. 2d at 1033.) California jury verdicts under the FEHA or Unruh Act often exceed $75,000. (*See*, *e.g*., *Peacock v. Quest Diagnostics*, C.D. Cal. Case No. 09CV09206(JHN), 27 Trials Digest 14th 10 (2010) (employee awarded $229,638 in compensatory damages on claims of disability discrimination, violation of CFRA, failure to accommodate, and failure to engage in the interactive process); *Spaulding v. Shannon Diversified, Inc*., San Bernardino Superior Court Case No.CIVDS-16-09525, JVR No. 1910040037, 2019 WL 4918279 (verdict for $128,762 on plaintiff's claim that his employer failed to accommodate him after a shoulder injury and terminated his employment due to his disability); *Toth v. Bartow Unified Sch. Dist*., C.D. Cal. Case No. 5:12CV02217, JVR No. 1505270035, 2014 WL 9859298 (verdict for $289,244 where plaintiff alleged he was unable to type and that his employer refused to provide him with administrative assistance with typing and instead ultimately providing him with voice recognition software but failed to provide him with training or support to use the software, thereby causing him to fall behind in his work and ultimately his constructive termination); *Dov vs. Ascot Hotel LLC*, 9 Trials Digest 11th 2, 2007 WL 4946166 (San Francisco Superior Court May 22, 2007 verdict in housing discrimination case under the Unruh Act where mentally disabled plaintiff alleged his landlord failed to accommodate his need for a companion cat; verdict for $50,400 compensatory damages, trebled pursuant to Civil Code § 52(a) plus $26,987 attorney fees); *Curry v. Academy Pointe, Inc*., 40 Trials Digest 21st 20, 2018 WL 4810695 (Los Angeles Superior Court February 26, 2018 verdict awarding $750,000 in damages under the Unruh Act and FEHA on plaintiff-tenant's claims that his landlord failed to properly maintain the buildings elevators, hence requiring him four to nine times in a four month period to seek assistance from neighbors or the fire department to carry him up and down the stairs).) True and correct copies of this verdict information are attached hereto as Exhibit 3.

51.     Cases under the Unruh Act involving allegations of a lone occasion of access denial have also settled for amounts exceeding the $75,000 jurisdictional threshold. (*Potter vs. CVS Pharmacy Inc*.,

6 Trials Digest 14th 5, 2010 WL 5659023 (N.D. Cal. August 17, 2010 Settlement) (settlement for $89,000 where plaintiff, who used a wheelchair for mobility, alleged he was unable to access hich defendant's pharmacy and left without his medication, and also encountered access barriers in the parking lot); *Dalton v. City of Oakland*, 28 Trials Digest 18th 7, 2014 WL 10098124 (N.D. Cal. 2014) ($95,000 settlement reached on plaintiff's claims that disabled parking spaces adjacent to 'Fairyland' had no unloading zones, were improperly configured, had no curb cuts and had no accessible paths of travel to the Fairyland entrance).)  Here, by contrast, Plaintiffs Lauridsen and Welte allege that they encounter difficulties with the accessibility of ADP's products routinely in connection with the performance of their work duties.  True and correct copies of this settlement information are attached hereto as Exhibit 4.

### b.    Damages for Violation of Privacy Rights

52.    The Complaint alleges that "for the past three years, during open enrollment LightHouse Staff have had to compromise their privacy and rely on assistance from their sighted colleagues or ADP representatives in order to make personal and private decisions about their benefits and compensation . . . ."  (Complaint ¶¶ 4, 9.)

53.    Jury verdicts and settlements in employee privacy rights cases are also sizeable.  (*Hoving v. San Luis Obispo County*, C.D. Cal. Case No. 2:07-cv-06853-GW-CT, JVR No. 494036 (September 2008 settlement for $660,000 where plaintiff alleged his employer video recorded him during a private meeting); *Boller v. Placer Union High School Dist.*, JVR No. 485001 (April 2000 verdict for $158,575 for employee who alleged violation of her privacy rights when she was stripped searched after she was accused of theft from a vending machine); *Zamora vs. Escondido Union School Dist.*, 34 Trials Digest 3d 11 (jury verdict on invasion of privacy claim for $240,000 where plaintiff/employee's prior felony conviction was disclosed); *Tran vs. Lehrer Management Co., Inc.*, N.D. Cal. Case No. C033601JF, 40 Trials Digest 7th 6 ($100,000 settlement where employee asserted her privacy rights were violated when her employer installed a program to track her computer use).)  True and correct copies of these verdicts and settlement information are attached hereto as Exhibit 5.

### c.      Declaratory and Injunctive Relief and Attorneys' Fees

54.      The same analysis set forth above with respect to the value of declaratory and injunctive relief and potential attorneys' fees exposure applies to the claims of Lauridsen and Welte.

55.      For all of the above reasons, the amount in controversy in this matter as to each of the individual Plaintiffs, and also in the aggregate, exceeds $75,000.

## V.      VENUE

56.      Plaintiffs filed this action in the Superior Court of California, County of San Francisco.

57.      The County of San Francisco lies within the jurisdiction of the United States District Court, Northern District of California.

58.      Therefore, without waiving Defendants' right to challenge, among other things, personal jurisdiction and/or venue by way of a motion or otherwise, venue lies in the Northern District of California pursuant to 28 U.S.C. §§ 84(c), 1441(a), and 1446(a).  This Court is the United States District Court for the district within which the State Court Action is pending.  Thus, venue lies in this Court pursuant to 28 U.S.C. § 1441(a).

## VI.      SERVICE OF NOTICE OF REMOVAL ON STATE COURT

59.      A true and correct copy of this Notice of Removal will be promptly served on Plaintiff and filed with the Clerk of the Superior Court of the State of California, County of San Francisco, as required under 28 U.S.C. § 1446(d).

60.      WHEREFORE, Defendants pray that this civil action be removed from the Superior Court of the State of California, County of San Francisco, to the United States District Court for the Northern District of California.

### DEMAND FOR JURY TRIAL

61.      Defendants demand a jury trial pursuant to the Seventh Amendment of the United States Constitution.

DEFENDANTS' NOTICE OF REMOVAL

1  DATED: December 16, 2020                    Respectfully submitted,

2                                              SEYFARTH SHAW LLP

3

4                                              By:  /s/ Eden Anderson
                                                   Kristina M. Launey
5                                                  Eden Anderson
                                                   Attorneys for Defendants
6                                                  AUTOMATIC DATA PROCESSING, INC.
                                                   and ADP TOTALSOURCE, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF REMOVAL

# EXHIBIT 1

DISABILITY RIGHTS ADVOCATES
STUART SEABORN (Bar No. 198590)
MEREDITH J. WEAVER (Bar No. 299328)
MELISSA RIESS (Bar No. 295959)
SHIRA TEVAH (Bar No. 307106)
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
sseaborn@dralegal.org
mweaver@dralegal.org
mriess@dralegal.org
stevah@dralegal.org

Attorneys for Plaintiffs

**NO SUMMONS ISSUED**

**FILED**

San Francisco County Superior Court

SEP 17 2020

CLERK OF THE COURT
BY: _____
Deputy Clerk

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

LIGHTHOUSE FOR THE BLIND AND
VISUALLY IMPAIRED OF SAN
FRANCISCO, a California non-profit
corporation; and ERIN LAURIDSEN and
FRANK WELTE, individuals,

Plaintiffs,

v.

AUTOMATIC DATA PROCESSING, INC., a
Delaware corporation; ADP
TOTALSOURCE, INC., a Florida
corporation; and DOES 1-5

Defendants.

Case No. **CGC-20-586626**

**COMPLEX CASE COMPLAINT**

1. Violation of California Civil Code § 51

2. Violation of California Civil Code § 51.5

3. Unfair and Unlawful Business Practices (Bus. & Prof. Code § 17200)

*(left margin)* DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Plaintiffs LightHouse for the Blind and Visually Impaired of San Francisco

2  ("LightHouse"), Erin Lauridsen, and Frank Welte (collectively "Plaintiffs") are informed and

3  believe, and thereon allege, as follows:

4                                         **INTRODUCTION**

5    1.    For over 100 years, Plaintiff LightHouse for the Blind and Visually Impaired of

6  San Francisco ("LightHouse") has supported and promoted the independence, equality and self-

7  reliance of people who are blind or have low vision in San Francisco and the surrounding area.

8  LightHouse employs over 100 people, around 55 percent of whom are blind or have low vision,

9  and many of whom use screen reading technology to access and interact with information and

10  services provided via digital platforms such as websites and mobile applications ("apps").

11    2.    LightHouse began purchasing cloud-based payroll and human resources services

12  from Defendant ADP TotalSource, Inc. ("TotalSource"), a subsidiary of Defendant Automatic

13  Data Processing, Inc. (collectively, "ADP"), in 2017. ADP, which has 58,000 employees and

14  reported 14.18 billion dollars in revenue for 2019, was ranked number 227 on the Fortune 500

15  list for 2020.[1] It was also named by Fortune magazine as one of the "World's Most Admired

16  Companies"—based on its "consistently strong performance"—for the 14th year in a row.[2]

17  Despite being a multi-billion-dollar global company that touts its commitment to accessibility, it

18  fails to take its obligations to customers with disabilities seriously.

19    3.    LightHouse staff who use screen reading technology immediately encountered

20  accessibility problems when they began using ADP's web-based product due to rampant

21  accessibility barriers. Despite repeatedly telling ADP about the problems and asking for them to

22  be fixed for several years, ADP provided only hollow assurances and failed to resolve them. To

23

24

25  [1] *Automatic Data Processing Company Profile*, Fortune 500,
   https://fortune.com/company/adp/fortune500/ (last visited Sept. 1, 2020).

26  [2] *ADP Recognized on FORTUNE Magazine's 2020 "World's Most Admired Companies" List for
27  14th Consecutive Year*, ADP, https://mediacenter.adp.com/2020-01-21-ADP-Recognized-on-
   FORTUNE-Magazines-2020-Worlds-Most-Admired-Companies-List-for-14th-Consecutive-
28  Year (last visited Sept. 1, 2020).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  this date, despite extensive notice and opportunity to do better, ADP does not provide full and

2  equal access to its products for its customers with disabilities.

3      4.    LightHouse staff who use screen readers cannot independently use key functions

4  of the ADP payroll and human resources product it purchases, such as submitting and approving

5  time off requests; viewing tax, compensation and benefits information; and timekeeping. The

6  product's inaccessibility prevents managers from doing their jobs and causes LightHouse to have

7  to overstaff certain roles as a result; and managers, non-managers, and administrative staff are all

8  forced to waste valuable time and resources in order to accomplish basic HR functions. For

9  example, for the past three years, during open enrollment LightHouse staff have had to

10  compromise their privacy and rely on assistance from sighted colleagues or ADP representatives

11  in order to make personal and private decisions about their benefits and compensation, because

12  ADP's products are not designed in a way that enables screen reader users to interact with them

13  independently.

14      5.    California law requires ADP to provide full and equal access to its products and

15  services to individuals with disabilities, including LightHouse staff who are blind or have low

16  vision. Not only has ADP failed to provide equal access by making its web-based product

17  accessible for people who use screen readers, despite repeated notice of its obligation to do so,

18  but screen-reader accessibility is easy to achieve. Many businesses have incorporated principles

19  of accessible design into their digital products and services to ensure that people who use screen

20  readers can interact with and use them. For example, companies in the personal banking and

21  finance industry have widely prioritized technological accessibility and created mobile apps and

22  websites that people who are blind or have low vision can use independently to access secure and

23  confidential information and complete secure transactions. Incorporating accessible design into a

24  website increases the business's potential customer pool and makes the site on average 35%

25  more usable for users who do not use screen readers, by improving the clarity and ease of

26  navigation of the site.[3]

27

28  [3] *See Digital Accessibility Resources*, AbilityNet, https://abilitynet.org.uk/accessibility-services/digital-accessibility-resources (last visited July 22, 2020).

---

*LightHouse for the Blind and Visually Impaired et al. v. Automatic Data Processing, Inc. et al.*
**Complaint**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

6.      Plaintiffs—LightHouse as an organization and two LightHouse employees who use screen reading technology—bring this lawsuit against Defendants Automatic Data Processing, Inc. and ADP TotalSource, Inc. under the Unruh Civil Rights Act and related anti-discrimination laws, because ADP has discriminated and continues to discriminate against people with vision disabilities who use assistive technology to access digital content, and companies that employ them, by failing to make the benefits and privileges of their web and mobile application[4] based services accessible[5] for people with vision disabilities. Defendants are in violation of the Unruh Civil Rights Act, California Civil Code § 51; California Civil Code § 51.5; and the Unfair Competition Law, California Business & Professions Code §§ 17200 et seq.

7.      Defendants' failure to integrate accessibility principles into the design of their website and mobile application has resulted in numerous problems for individuals accessing those platforms with screen readers or other assistive technology. Such problems include, but are not limited to links that are not read by a screen reader, unfillable forms, and unlabeled drop-down menus, resulting in individuals who are blind or have low vision being unable to, or spending unreasonable amounts of time to, perform basic tasks like logging or reviewing hours or requesting or approving time off.

8.      Defendants are aware that their products and services are not accessible for people who are blind or have low vision and use assistive technology. ADP has willfully and intentionally discriminated against Plaintiffs and continues to do so by refusing to integrate accessibility principles into its website and mobile application design and by instead adopting a piecemeal approach that has not resulted in a platform that provides full and equal access as required by state law. Despite Plaintiffs' repeated requests, throughout several years of structured negotiations, that Defendants remedy their failure to provide accessible content to individuals

---

[4] Defendants' "mobile application" refers to the ADP mobile application for iOS and/or Android.
[5] For the purpose of this Complaint, we use the term "accessible" to refer to digital content that can be independently accessed and interacted with by a person who is blind or has low vision using a screen reader or other assistive technology, such as screen magnification, to a comparable extent and with comparable ease as a person who is sighted.

*LightHouse for the Blind and Visually Impaired et al. v. Automatic Data Processing, Inc. et al.*
Complaint                                           3

1   with vision disabilities employed at LightHouse, and to LightHouse, Defendants intentionally

2   discriminate against Plaintiffs by refusing to do so.

3        9.     As a result of ADP's discriminatory conduct, Plaintiffs have (1) been fully denied

4   access to the privileges and services of ADP's product; (2) been forced to compromise their

5   privacy and independence in order to access privileges and services of ADP's product; and (3)

6   been required to expend unreasonable amounts of time in order to access privileges and services

7   of ADP's product. This discrimination harms LightHouse as well as its employees who use

8   screen readers.

9        10.    Plaintiffs ask this Court to declare that ADP's conduct is discriminatory,

10   unlawful, and unfair, and ensure that ADP provides them equal access to its mobile application

11   and website.

12   **PARTIES**

13        11.    Plaintiff LightHouse is a non-profit organization based in San Francisco that

14   promotes the independence, equality and self-reliance of—and also employs approximately 55—

15   people who are blind or have low vision. LightHouse offers blindness skills training and relevant

16   services such as access to employment, education, technology, information, recreation,

17   transportation and the environment. LightHouse also pursues the development of new

18   technology, encourages innovation, and amplifies the voices of blind individuals around the

19   world. LightHouse services range from cooking classes to braille instruction to providing

20   counseling to offering boot camp for people who are newly blind. In 2019, Lighthouse hosted ten

21   summer camp sessions for 486 blind campers of all ages from all over the world; supported three

22   Holman Prize for Blind Ambition winners in projects aimed at changing the world's perception

23   of blind ability; hosted an annual disability film festival; translated hundreds of pages of

24   material, maps, and other types of media into accessible formats; employed blind workers at the

25   Sirkin Center light-manufacturing plant; and served over 1,000 people in 45 California counties

26   with services including counseling, rehabilitation, employment immersion, orientation and

27   mobility training, and advocacy. Lighthouse has been harmed and continues to be harmed by

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   ADP's failure to make its services accessible despite being on repeated notice of the need to do

2   so.

3       12.    Plaintiff Erin Lauridsen is LightHouse's Director of Access Technology. She has

4   worked at LightHouse since April 2017.  Ms. Lauridsen has been harmed and continues to be

5   harmed by ADP's failure to make its services accessible despite being on repeated notice of the

6   need to do so.

7       13.    Plaintiff Frank Welte is LightHouse's Senior Accessible Media and Braille

8   Specialist. He has worked at LightHouse since 2011. Mr. Welte has been harmed and continues

9   to be harmed by ADP's failure to make its services accessible despite being on repeated notice of

10  the need to do so.

11      14.    Defendant Automatic Data Processing, Inc. is a global provider of cloud-based

12  human capital management solutions that unite HR, payroll, talent, time, tax, and benefits

13  administration. Automatic Data Processing, Inc.is incorporated under the laws of the State of

14  Delaware and serves over 800,000 clients in more than 140 countries. Defendant Automatic Data

15  Processing, Inc. is a "business establishment" within the meaning of the Unruh Act and section

16  51.5, which cover "business establishments of every kind whatsoever."

17      15.    Defendant ADP TotalSource, Inc is a subsidiary of Automatic Data Processing,

18  Inc. that provides its professional employer organization (PEO) services through a co-

19  employment relationship in which employees who work at a client's location are co-employed

20  by ADP and its clients. TotalSource is incorporated under the laws of Florida. TotalSource is a

21  "business establishment" within the meaning of the Unruh Act and section 51.5, which cover

22  "business establishments of every kind whatsoever."

23      16.    Defendants Does 1 through 5 are persons or entities whose true names and

24  capacities are unknown to Plaintiffs, who therefore sue them by such fictitious names. Plaintiffs

25  are informed and believe, and on that basis allege, that each of the fictitiously named Defendants

26  perpetrated or is responsible for some or all of the wrongful acts and omissions alleged herein.

27  Plaintiffs will seek leave of court to amend this complaint to state the true names and capacities

28  of such fictitiously named Defendants if and when they are ascertained.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

17.    At all times mentioned herein, each Doe Defendant was a parent, subsidiary, or agent of the other Defendants and was acting within the course and scope of such agency or employment. The Defendants are jointly and severally liable.

## VENUE

18.    Venue is proper in this Court and in this County pursuant to California Code of Civil Procedure §§ 395 and 395.5, because Defendants do business in this County, the business practices at issue were conducted in this County, liability arose in this County, and events and conduct giving rise to the violations of law asserted herein occurred in this County.

## ALLEGATIONS OF FACT

### *ADP Is A Global, Multi-Billion Dollar Company That Sells Human Resources Management Services*

19.    ADP serves more than 800,000 customers in over 140 countries. In 2020, it was number 227 on the Fortune 500 list, which ranks the top-earning U.S. corporations in order of revenue. It reported 14.18 billion dollars in revenue for 2019.

20.    ADP provides certified professional employer organization ("PEO") services through ADP TotalSource. ADP Total Source's Workforce Now ("WFN") offers human resources and payroll products and services through its website, [6] https://workforcenow.adp.com/workforcenow/login.html, and mobile applications or "apps" for Android and iOS devices,[7] rather than through software. Companies who purchase WFN, and their employees, are meant to be able to access the services of and interact with the website and mobile application in a manner similar to an in-house Human Resources department.

21.    Self-service employee functions that are available on the ADP website and app include, but are not limited to, punching in and out; making benefits selections; listing and

---

[6] Throughout this Complaint, references to the "website" refer to this WFN website, and references to ADP's products and services refer to those available with WFN.

[7] The Android app is available for download at https://play.google.com/store/apps/details?id=com.adpmobile.android&hl=en_US; and the iOS app is available for download at https://apps.apple.com/us/app/adp-mobile-solutions/id444553167.

---

1  maintaining emergency contact information; requesting time off; accessing pay, tax, and direct

2  deposit information; and viewing annual holidays.

3      22.    Manager functions that are available on the ADP website and app include, but are

4  not limited to, approving time off; reviewing and correcting timesheets; onboarding; hiring;

5  workers' compensation; and tracking company property.

6  ***LightHouse Has Suffered Unequal Access to ADP's Products and Services Since 2017***

7      23.    LightHouse has purchased and used Workforce Now human resources and payroll

8  products and services since October 2017.

9      24.    More than half of LightHouse's approximately 100 employees are blind or have

10  low vision.

11      25.    These individuals have encountered significant accessibility barriers while using

12  the WFN website and mobile application, making it difficult for users who are blind or have low

13  vision to navigate and use ADP's products and services, and in some cases preclude them

14  altogether. LightHouse staff members who are blind or have low vision have reported the

15  following barriers to accessing the products and services provided on ADP's website and app:

16  links do not work; screen reader users have difficulty submitting responses through the website;

17  elements, such as edit fields, graphic links, and drop down menus are not labeled, inappropriately

18  labeled, or otherwise difficult to interact with for screen reader users; inconsistent organization

19  makes navigating the site and app unreasonably time consuming for screen reader users; menus

20  are inaccessible such that a screen reader cannot navigate or select items within them; pop-up

21  messages are not spoken by screen readers; and the color scheme and font make it difficult for

22  people with low vision to navigate the app and the website.

23      26.    These barriers prevent LightHouse staff from independently completing key

24  administrative functions and require them to rely on others to communicate sensitive personal

25  information. Additionally, these barriers significantly extend the amount of time it takes for staff

26  to complete simple tasks.

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

### *Many Individuals Who are Blind or Have Low Vision Use Assistive Technology to Access Digital Content*

27.   To access products and services provided through mobile applications and on websites, individuals who are blind use screen reading software—assistive technology that interacts with the app's or website's digital elements, such as images, text, buttons, links, and headings, and converts that information into audible synthesized speech or outputs that information on a digital braille display.

28.   Screen readers are integrated into both the iOS and Android mobile device operating systems.

29.   The screen reader integrated into iOS is called VoiceOver.[8]

30.   The screen reader integrated into Android is called TalkBack.[9]

31.   Screen readers for mobile devices allow users to interact with applications through gestures such as swipes and taps that do not depend on visual acuity. For instance, using VoiceOver with a properly coded application, a user can touch or drag their finger around the screen to hear what is there, tap to hear a button's description, double-tap to select a button, or flick left and right to move from one element to the next, and much more.

32.   VoiceOver is also integrated into Apple's computer operating system, macOS.[10]

33.   The Windows 10 computer operating system also has an integrated screen reader, called Narrator.[11]

34.   Many people prefer to use a separate screen reader for their computers. Popular independent screen readers for computers include Job Access With Speech ("JAWS") and NonVisual Desktop Access ("NVDA").

---

[8] *See Vision Accessibility -iPhone*, ACCESSIBILITY, https://www.apple.com/accessibility/iphone/vision/ (last visited May 26, 2020).

[9] *See Google*, Get started on Android with TalkBack, ANDROID ACCESSIBILITY HELP, https://support.google.com/accessibility/android/answer/6283677?hl=en (last visited May 26, 2020).

[10] *See Vision Accessibility -Mac*, ACCESSIBILITY, https://www.apple.com/accessibility/mac/vision/ (last visited May 26, 2020).

[11] *See Windows Support*, Complete Guide to Narrator, https://support.microsoft.com/en-us/help/22798/windows-10-complete-guide-to-narrator (last visited May 26, 2020).

---

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

35.     Screen readers for computers allow users to interact with websites using a keyboard to navigate throughout a website and use features and elements on webpages such as links, buttons, and forms. For example, using JAWS with a properly coded website, one can use the arrow or tab key to move sequentially through the items on a page, the enter key to select an element or click a button, and the H key to scroll through headings, as well as other key strokes and combinations.

### *Websites and Mobile Apps can Easily be Designed to Ensure that People Who Are Blind or Have Low Vision Can Access Their Content*

36.     Many companies and organizations who do business online through websites and apps have made their products and services compatible with screen readers and assistive technologies. For example, SalesForce[12], Barclays Bank[13], and Atos (a global information technology company)[14], offer complicated on-line web interfaces and provide services implicating large amounts of sensitive information, and have established a high degree of compatibility with web accessibility guidelines. Incorporating accessibility into website and app design not only opens these companies up to a larger customer base, it has the effect of improving the usability of websites and apps for users who do not use assistive technology as well.[15]

37.     In addition to screen reader compatibility, websites and mobile applications can be designed to be accessible for individuals with low vision, by using texture or monochromatic shading instead of color to convey information, placing text in one continuous vertical block, and ensuring a high contrast between background and text color. Because users can adjust many

---

[12] *Product Accessibility Status*, Salesforce, https://www.salesforce.com/company/legal/508_accessibility/#:~:text=Product%20Accessibility%20Status&text=Salesforce.com%20is%20committed%20to,applications%20accessible%20to%20all%20individuals.&text=A%20third%20party%20vendor%20has,accessibility%20status%20using%20these%20ACRs. (last visited Sept. 1, 2020).

[13] *Barclays Bank Case Study*, W3C Web Accessibility Initiative Engage Community Group, https://www.w3.org/community/wai-engage/wiki/Barclays_Bank_Case_Study (last visited Sept. 1, 2020).

[14] *Accessibility*, Atos, https://atos.net/en/accessibility (last visited Sept. 1, 2020).

[15] *Digital Accessibility Resources*, AbilityNet, https://abilitynet.org.uk/accessibility-services/digital-accessibility-resources (last visited July 22, 2020).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   visual settings such as size and color in their own browsers, it is important that website content

2   be independent of its structure or presentation.

3       38.    An international body called the World Wide Web Consortium (W3C) Web

4   Accessibility Initiative (WAI) has developed guidelines and extensive resources regarding

5   designing accessible websites and apps.[16]

6       39.    Third-party applications on iOS and Android can be developed so that they are

7   compatible with VoiceOver and TalkBack.[17]

8       40.    Developing mobile applications for compatibility involves steps like adding

9   accessibility information to an application's user interface elements, grouping elements so that

10   they are read in the correct order, and including descriptive text for changes in state such as

11   option selection.

12       41.    Developing websites for compatibility involves steps like using different levels of

13   headings appropriately to organize the content on a webpage in a way that makes it navigable;

14   including text for images that serve a substantive, non-decorative function; providing descriptive

15   names for links; providing descriptive labels for form fields and alerting the user when certain

16   fields are required; properly coding tables; and providing ways for users to skip to the main

17   content on a page.[18]

18       42.    In order to maintain website accessibility, companies must have a process for

19   incorporating accessible design principles into product development, so that gains in accessibility

20   are not lost as the products change over time. Many companies have in place process-based

21   models, such as the accessibility maturity model, to ensure the on-going accessibility of their

22   products.

23

24

---

25   [16] *Accessibility Fundamentals Overview*, W3C, https://www.w3.org/WAI/fundamentals/ (last
visited Aug. 11, 2020).

26   [17] *See Accessibility on iOS*, APPLE DEVELOPER, https://developer.apple.com/accessibility/ios/
(last visited May 26, 2020) (providing guidance to third-party developers on how to integrate
27   accessibility into development); *Accessibility Overview*, ANDROID DEVELOPERS,
https://developer.android.com/guide/topics/ui/accessibility (last visited May 26, 2020) (same).
28   [18] *See id.*

---

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    *LightHouse has been harmed by Pervasive Access Barriers in ADP's Products*

2        43.    ADP's failure to make its products and services accessible to individuals who use

3    assistive devices has rendered those products and services all but unusable to many of

4    LightHouse's employees and staff. As a result, a product which ADP touts will allow its clients

5    to "quickly and accurately process payroll" and equip their employees with "anytime, anywhere

6    self-service access to their information"[19] has done the opposite for LightHouse.  Accessibility

7    barriers have multiplied the amount of time that LightHouse staff must spend on basic payroll

8    and human resources tasks. Far from providing employees self-service access, barriers in ADP's

9    products mean screen reader users must rely on sighted colleagues to access sensitive and private

10   information related to their employment and compensation.

11       44.    LightHouse employees who use screen readers cannot reliably use the ADP app

12   and website to clock in and out of work. The time clock often fails to record a time punch,

13   records a double time punch, or records the punch properly but fails to inform the employee. At

14   least one hourly employee who is blind and uses the app with VoiceOver to clock in and out

15   every day finds that the process is almost never smooth: the main Dashboard button, which they

16   double-click to activate the time clock, often does not appear when activated; often other

17   controls open up instead or the whole screen becomes unresponsive to VoiceOver and they must

18   restart the process. In addition, the "Punch" and "Meal Out" buttons in the time clock are

19   unreliable:  sometimes these buttons provide no audio feedback so the user cannot tell if they

20   have been activated; sometimes they provide audio feedback that they *have* been activated, but

21   the employee's time records do not reflect the attempted entry; and sometimes pressing the

22   buttons initiates a pop-up in the app confirming the activation with an "Ok" button, which then

23   results in an extraneous time punch.  These issues occur multiple times a week, requiring the

24   employee to spend additional time reviewing their time sheets and contacting their supervisor

25   and sighted staff in the finance department to make manual adjustments to correct issues. The

26   difficulty of using the app to clock in and out cuts into this employee's time to perform their

27

28   [19] ADP WorkForce Now Features and Benefits, https://www.adp.com/what-we-offer/products/adp-workforce-now.aspx (last visited July 22, 2020).

*LightHouse for the Blind and Visually Impaired et al. v. Automatic Data Processing, Inc. et al.*
**Complaint**                                                                                    11

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  substantive work tasks, reduces their focus by creating frustration, and can result in incorrect

2  payments being issued to them for their hourly work. Another hourly employee stopped using

3  the app or website to clock in and out as of August 2018 after extensive difficulties using them

4  with screen reader technology. Instead, the employee sends their hours directly to their

5  supervisor, who spends additional time entering the employee's hours. Another hourly employee

6  who is blind recently spent an hour attempting to punch out using VoiceOver and was never able

7  to navigate to the button despite many attempts.

8      45.    As a result of these infuriating barriers to using the timekeeping functions of the

9  app, LightHouse's Director of Finance, who is sighted, receives approximately ten requests per

10  pay period from hourly employees to fix time punches that were entered incorrectly because of

11  the inaccessibility of ADP's app and website. The finance director must manually fix each error

12  and document their entry into the system to do so. The finance director also reviews and

13  approves approximately twenty employee time sheets on behalf of their direct supervisors who

14  are blind or low vision who are unable to do so themselves because of the inaccessibility of

15  ADP's systems. This often requires individual follow-up with those twenty employees regarding

16  irregularities in their timecards, which also frequently were the result of ADP's inaccessibility.

17  In addition, approximately once a month, the finance director must spend time accessing the pay

18  statements for an employee in order to print, scan, and send them to the employee to review with

19  their SSI counselor, as the employee is often unable to access the information on their own using

20  a screen reader because of ADP's inaccessibility. Similarly, the finance director spends extensive

21  time printing, scanning, and sending W2s to employees who are unable to access them

22  independently on ADP's platforms like sighted employees can.  In addition, the finance director

23  has to assist exempt staff who use screen readers in entering Bereavement Leave on their time

24  sheets.

25      46.    Employees who use screen readers are often completely unable to perform tasks

26  independently such as selecting benefits, requesting time off, checking accrued PTO, viewing,

27  downloading, or printing pay stubs, and viewing the list of companies offering discounts through

28  ADP.  Therefore, they must rely on other, sighted staff members to perform these tasks for them,

---

*LightHouse for the Blind and Visually Impaired et al. v. Automatic Data Processing, Inc. et al.*
**Complaint**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  compromising the individual's confidentiality as well as the efficiency of LightHouse as an

2  organization. These problems remain true of tasks that Defendants represent have been

3  accessibility enabled via their third-party overlay, as well as tasks that Defendants have

4  acknowledged have not yet been accessibility enabled.

5       47.    LightHouse has been particularly harmed by ADP's inaccessibility during the

6  COVID-19 pandemic, when most staff are working remotely. This has exacerbated the impact of

7  the functional unavailability of ADP features for screen reader users on the organization as a

8  whole. For example, a LightHouse employee who participates in the United States Social

9  Services Administration's "Ticket to Work" program is required to submit their paystubs

10  monthly to the Ticket to Work program managers. This employee usually obtains hard copies of

11  their paystubs at the LightHouse office. The employee should have been able to download their

12  paystubs from ADP's website or mobile app, as sighted users can do, but was not able to do so

13  using a screen reader. Instead, another employee was required to begin obtaining their paystubs

14  and sending them in the mail.  Thus, privacy, efficiency, and health have all been compromised

15  by ADP's continued refusal to make its services accessible to individuals who are blind.

16       ***Erin Lauridsen has been harmed by Pervasive Access Barriers in ADP's***
           ***Products***

17

18       48.    ADP's intentional discrimination against individuals who use assistive devices to

19  access digital ADP TotalSource's products and services harms Erin Lauridsen.

20       49.    Ms. Lauridsen uses the VoiceOver screen reader technology to navigate the ADP

21  app, and the JAWS screen reader to navigate the ADP website.

22       50.    Ms. Lauridsen usually supervises four to five people and her HR responsibilities

23  as a supervisor include onboarding, reviewing and correcting her team members' timesheets,

24  responding to their time off requests, and informing them of their time off balances. As an

25  employee, the administrative HR tasks she performs include selecting or changing benefits and

26  beneficiaries, keeping time records, viewing pay and tax information, and requesting time off.

27       51.    Ms. Lauridsen has been unable to use the ADP app and website to perform

28  necessary tasks related to her own employment as well as her role as a manager. She has been

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  unable to update her emergency contact information; view and approve her supervisees' time off

2  requests; or review and approve supervisee time sheets on either the app or website.

3      52.   Ms. Lauridsen has been unable to participate independently in open enrollment. In

4  2018, she was required to schedule an in-person appointment during limited in-person hours to

5  complete her open enrollment. In 2019, she used the external technology company Aira to access

6  the open enrollment website, after attempting unsuccessfully to do so independently. In 2020,

7  she was advised to call the ADP MyLife advisors—whose role is to "help [employees] make

8  important life decisions, tackle day-to-day challenges, and prepare for a brighter tomorrow [by] .

9  . . [a]chieving key milestones, [m]anaging uncharted life moments, [p]lanning for the future,"

10  and "[n]avigating complex processes"[20]—in order to complete her enrollment. She was unable to

11  do so within the timeframe provided and was consequentially enrolled in default options. She is

12  now unable to even identify what benefits plans she is enrolled in without calling the MyLife

13  advisors.

14      53.   Ms. Lauridsen has been required to spend additional time on other tasks that

15  cannot be completed reasonably efficiently using a screen reader, for example, viewing

16  notifications in the app or checking supervisees' vacation and time off balances. Because the app

17  notifications for employee time off requests are unlabeled, she must navigate the complex and

18  inconsistent menu system to find the inbox to approve requests. If there are multiple requests,

19  she often has to open them multiple times, because the app does not indicate in an accessible

20  manner whether they have been resolved.

21      54.   Ms. Lauridsen supervises employees who are blind and use assistive technology.

22  These supervisees email Ms. Lauridsen when they have difficulty clocking in and out because of

23  the app's and website's inaccessibility. But Ms. Lauridsen is unable to correct their timesheets

24  independently, also because of the platforms' inaccessibility, and must escalate the problems to

25  the finance director.  Further, because error messages and highlighting for these timesheet

26  features in the app and website are not accessible, if there are errors on a supervisee timesheet

27

28  [20] *Contact Us*, ADP Total Source MyLife, http://mylife-ts.adp.com/contact-us/ (last visited Sept. 1, 2020).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  that are not discovered during the pay period, Ms. Lauridsen must review every single time

2  stamp entry in order to find the missing punch in or out on the timesheet. She then contacts the

3  employee to verify the correct hours, but must request that the director of finance input the

4  corrections as she is not able to do so herself. These types of errors occur, and Ms. Lauridsen is

5  required to go through this process, during almost every pay period.

6      55.    In addition, Ms. Lauridsen spends extra time attempting to complete these various

7  tasks using both the website and the app, as sometimes she is able to do so on one platform but

8  not the other or vice versa.

9      ***Frank Welte has been harmed by Pervasive Access Barriers in ADP's Products***

10      56.    ADP's intentional discrimination against individuals who use assistive devices to

11  access digital ADP TotalSource products and services harms Frank Welte.

12      57.    Mr. Welte uses VoiceOver to use the ADP app, and JAWS to access the ADP

13  website.

14      58.    As an employee, the administrative HR tasks he performs include selecting or

15  changing benefits and beneficiaries, keeping time records, viewing his pay and tax information,

16  and requesting time off.

17      59.    Mr. Welte has been unable to use the ADP app or website to perform necessary

18  tasks related to his employment, including selecting benefits or requesting time off, viewing

19  personal financial or tax information, and viewing time off balances.

20      60.    For example, on May 13, 2020, while attempting to enter a time off request on the

21  website, Mr. Welte spent two hours on the phone with ADP support personnel attempting to

22  change his password because he was unable to log in, and he was unable to reset his password

23  independently. After the support representative changed his password for him, he was still

24  unable to log in using Voiceover. The representative terminated the call in order to consult with

25  ADP technical support staff. Mr. Welte was able to log in the next day, but unable to submit a

26  time off request either online or on the mobile application because the inaccessibility of both

27  platforms.

28      61.    Mr. Welte has also been unable to participate independently in open enrollment.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

***Pervasive Barriers in ADP's Products Prevent Full and Equal Access for People with Disabilities***

62.     Defendants' app and website contain myriad access barriers that prevent full and equal use by persons who are blind and use screen-reading software, including Plaintiffs Erin Lauridsen and Frank Welte.

*Access Barriers in ADP's Mobile App*

63.     Access barriers in the ADP mobile app include but are not limited to:

(a) **Improperly labeled elements.** Elements throughout the app are improperly labeled such that their content and function are not evident to a blind user. For instance, in the iOS app:

(i) In the Dashboard, the "notifications button" is read by VoiceOver as "icon bell button". This label does not provide any useful information regarding what the feature is or where the button will lead.

(ii) Within the Notification Center—which serves as kind of inbox for notifications such as supervisees' time-off requests and available pay statements—the information provided to sighted users for each entry, including how long ago each notification was received and the subject of each notification, is not provided via screen reader. Instead, each entry is read as "time body button." If a user can figure out that "time body button" indicates a notification, they might be able to identify how many notifications there are by swiping through, but not what the notifications pertain to. The user must take the time to activate or enter each notification in order to learn its content.

(iii) Within the form to add an emergency contact, there is no indication that an element read simply as "first name" must be activated in order to access a text field.

(b) **Improper reading order.** In some cases, information on the page is read in a confusing order. For instance:

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

(i) When the main menu is activated from the Dashboard, a screen reader user navigates to the menu in the reverse order, from the bottom up. This is confusing and inefficient for a screen reader user because navigating down a menu involves swiping right, while navigating up a menu involves swiping left. The user would have to spend additional time experimenting to figure out that the menu is reversed.

(c) **Exclusively visual information and features**. Some information is only communicated to users visually and is completely undiscoverable via screen reader. For instance:

(i) The visual notifications icon at the top right on the Dashboard will indicate how many new unread notifications the user has; however, this information is not read on VoiceOver. Thus, a blind user is likely to miss new notifications and not respond promptly.

(ii) Within the Notification Center, the status of a notification as read or unread is only indicated visually through a change in color of the text. This compounds the fact that the title of each notification is not read by VoiceOver.

(d) **Unannounced changes of state**. Thus, a blind user does not know where they have ended up after clicking a link or button. For instance:

(i) Upon activating a button in the main menu, there is no indication to a blind user that a sub-menu has opened with additional options.

(ii) Upon activating the button to add an emergency contact, there is no announcement when the screen changes from the Profile page to a form to add such a contact.

(e) **Improper focus.** When a screen reader moves to a new element in a page, that is called shifting focus. Sometimes, a user expects the screen reader to re-focus automatically on new information on the screen, for instance when a

submenu opens, or a pop-up appears.  The ADP app frequently does not

refocus in this way.  For instance:

(i)  Upon selecting the Myself button in the main menu, the screen reader does

not refocus on the newly-opened submenu.

(ii) When an Emergency Contact element is activated from the Profile page,

the screen reader does not shift focus to the new page that appears

visually.  A screen reader user must continue to guess through the

navigation, and correctly assume that an element read as "A-D-D", which

is not visible to a sighted user, must be clicked in order for the focus to

change.

(iii)When adding an Emergency Contact, upon selecting the primary contact

radio button, the focus moves back to the top of the page rather than

remaining on the element and indicated the change in state.

(f) **Elements are discoverable via screen reader that should be hidden.**  A

screen reader user should only be able to navigate to those elements that are

also visually apparent on any given page. However, within the ADP app,

elements that are not present visually are accessed via screen reader.  For

instance:

(i)  When a screen reader user navigates from the main menu to the Profile

page, via the Myself submenu, a screen reader user must scroll through at

least fifteen elements that are not represented to a visual user before they

get to the content of the page.  Some of these elements seem to be coming

through from the main menu and myself submenu, while others are

completely unlabeled. A sighted person can tell that these are not

applicable to the visible page, but a blind user has no indication whether

these are elements that are intended to be presented on the page.

(g) **Forms within the app are not coded properly.** This has made the

Emergency Contact form, for example, completely unusable as well as

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    confusing and inefficient to VoiceOver users. While the screen reader user can

2    fill out some portions of the form by guessing that what appears as static text

3    is actually an element that can be activated, not all fields can be completed

4    this way.  The relationship field is required in order to save the contact,

5    however there is no way to activate or use the drop-down menu associated

6    with this field via VoiceOver. When a user attempts to activate the list,

7    VoiceOver only narrates "Relationship, list start, star, list end." Because the

8    user cannot select a relationship type and it is a required field, they cannot

9    save any of the emergency contact information.

10   (h) **The calendar function on the app does not function properly with**

11   Voiceover. When a user attempts to request time off, they are unable to use

12   the date picker to select the date/s they want, rendering this element

13   functionally unavailable.

14   *Access Barriers in ADP's Website*

15   64.   Access barriers in the ADP website include but are not limited to:

16   (a) **Lack of adequate structure, grouping, reading order, and labeling.**

17   (i)  One way that screen-reader users navigate a page is by scrolling through

18   content that has been labeled as headings. Just as sighted users rely on

19   formatted headings to skim a page and quickly locate desired content,

20   screen-reader users rely on labeled heading levels. Many of the pages

21   within the ADP website lack any heading level structure. This

22   significantly impedes a blind user's ability to efficiently use the site in the

23   same way that a sighted user can. For example, on the Home page for an

24   employee after logging in, using the arrow or tab keys in JAWS to scroll

25   through the initial elements on the page—which visually are depicted as

26   an envelope icon, calendar icon, and a "Logout" button—results in JAWS

27   reading "messages" more than a dozen times over and not reading the

28   calendar icon or logout button at all.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

(ii) In addition, on the "My Information" page under the "Myself" tab from the main home page menu, a sighted user sees text boxes on the page with bold headings labelled "Personal Info," "Work Info," "Compensation Info," "Professional Credentials," "Company Property," and "Emergency Contacts." But these headings are not coded as headings for a screen reader. A JAWS user instead has to scroll or tab through every line of text on the page in order to locate content, and there is no grouping or categorizing of the information as the boxes create for a sighted user. In order to reach "Emergency Contacts," a JAWS user has to scroll past their name, phone number, email address, physical address, position ID, hire date, title, phone number, work email address, work address, total compensation, pay rate, and pay frequency. If the headings on the page were coded properly, a JAWS user would only need to scroll past three headings in order to reach Emergency Contacts.

(iii) The "Time Off Balances" page for a supervisor is inaccessible because of how it is organized and coded. Upon loading the page, a banner with the information of one employee appears, with arrows that say "1 of 8," but JAWS only reads "ADP"—there is no information identifying the content of the page for a screen reader user. Using the tab key to scroll through the page first returns the screen reader user to the main headings at the very top, which are not specific to the Time Off Balances page. Then it simply reads the text in the banner pertaining to a specific employee. The page lacks any structure to enable the user to easily identify the focal point of the page. It also lacks any heading or obvious way for the screen reader user to find employees other than the one on the page. They must scroll through all of that specific employee's information to get to the "search," "previous," and "next" buttons, which are not coded in a way that indicates that they are functional buttons and differentiates them from, for

1    example, the employee's start date. The search button does not indicate

2    whether it is for searching for specific employees or lists of employees,

3    and does not ultimately allow the user to search for a specific supervisee

4    but rather provides a roster of supervisees. Upon selecting a specific

5    employee, a new page loads and again returns the user to the highest-level

6    website headings. There is no heading to enable the user to skip through

7    all the employee's information and go directly to their time off balances.

8    **(b) Failure to announce status changes.** A screen reader must be able to

9    accurately inform a user when a button or element is expanded or collapsed.

10   In navigating around the ADP website home page main menu, a JAWS user

11   cannot identify which options are grouped under "My Team." This is because

12   the first option in the pop-out menu under "My Team" is also "My Team" and

13   there is no indication of a change in state or focus to a new menu. This results

14   in JAWS indicating "My Team – Expanded" followed immediately by "My

15   Team – Collapsed." This problem is also present on the self-service Time Off

16   request page. Plaintiff Frank Welte using JAWS has no way to tell whether a

17   request has been submitted, and if so, for what dates. Using the down arrow to

18   enter a date on the calendar on this page, JAWS does not indicate whether the

19   control has changed, and the user must tab back out of the calendar to learn

20   the state of the control.

21   **(c) Poorly developed and coded forms.** Forms in the ADP website are

22   inaccessible both in terms of the coding and the structure. For example, the

23   Emergency Contact form's first field is ambiguously labeled "Name," which

24   does not inform a user whether it requires a first name or a full name. While a

25   sighted user can see that there is only one box, and deduce that the field

26   requires both first and last name, the field should be labelled "Full Name" or

27   "First and Last Name" to communicate that same information to a screen

28   reader user without the need to tab through the page to assess all of the other

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    fields before navigating back to input the correct version of a name. More

2    importantly, the user is required to enter a relationship type for the emergency

3    contact, and the relationship type drop-down menu is unusable with JAWS.

4    Attempting to use the arrow or enter button to navigate the drop-down menu

5    results in the user involuntarily selecting the next option on the list in

6    sequential order, rather than expanding the list, and then returning to the

7    "Name" field and starting over. A JAWS user attempting to expand the drop-

8    down menu will first be required to select "Doctor," then return to the "Name"

9    field, scroll past to the relationship drop-down menu to see that "Doctor" is

10   selected, and upon attempting to expand the menu again, they will

11   involuntarily select the next relationship, "x—ex-spouse."[21] Using the key

12   combination alt+down arrow for the relationship element results in JAWS

13   informing the user that the menu is expanded, and the menu becomes visible

14   to a sighted user, but as the JAWS user scrolls through the items in the

15   expanded drop-down menu, it reads no text. The same issue recurs with the

16   "Phone Type" drop-down menu for the emergency contact.

17   **(d) The website contains hidden or missing elements.** The Home page contains

18   a button/link, at least as of May 1, 2020, labeled "COVID-19 Updates."

19   However, using JAWS to tab through the headings on the Home page does not

20   identify this link for a blind user. The "COVID-19 Updates" link does not

21   even register for JAWS as an unlabeled element, meaning that a screen reader

22   user would have no way to even know there is something there.

23

24

25

---

[21] The relationship drop-down menu has letter codes for each relationship type except "Doctor." "Ex-spouse" is listed as "X—ex-spouse;" "Sister" is listed as "SI—sister;" "Son" is listed as "S—Son;" "Roommate" is listed as "RO—Roommate;" "Mother" as "M—Mother;" and so on. This is confusing for a screen reader user, because they cannot tell whether "X—ex-spouse" refers to an ex-ex-spouse, an ex-spouse, or a spouse or ex-spouse with an X functioning as a checkmark to indicate selection. Design problems like this compound the problems with inaccessible coding.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   (e) **The website contains unlabeled elements.** For example, on the Profile page,

2   there are two camera icons near the employee name at the top of the page that

3   JAWS reads only as "unlabeled button." These icons should both be labeled

4   for a screen reader, or, if the two icons are redundant and actually serve the

5   same single function, one of them should be removed to avoid any confusion.

6   In addition, in the "Time Off Balances" page for managers, there is an

7   unlabeled element next to the calendar element depicting the current date for

8   the balances being viewed.

9   (f) **The website contains improperly coded tables**. When a table is coded

10  properly for screen readers, a user can navigate the table using special table

11  commands. These commands enable a screen reader user to navigate down a

12  column or across a row. This function is critical both for knowing what the

13  information in a table cell refers to and for comparing information in a

14  particular category. For example, in the "Time Off Balances" page for

15  managers, there is a table listing the manager's team members by row with

16  columns for each type of time off. But the table is not coded properly and a

17  screen reader user would have to memorize the order and content of the table

18  headings and then count the cells in a row in order to match up a particular

19  cell in a row with its identifying column heading. This precludes a manager

20  using a screen reader from being able to accurately and efficiently identify and

21  report employees' time off balances. Similarly, on the "Time Off – List of

22  Requests" page for managers, there is a table listing each team member's

23  request. But each row of the table is coded as its own table so the screen

24  reader user cannot read the table by column to view, for example, all

25  employees with approved requests.

26

27

28

***ADP Is Intentionally Discriminating Against People Who Use Assistive Devices To Access Content***

65.     The pervasive accessibility problems with ADP's products quickly became apparent to LightHouse staff, who took steps to bring these problems to ADP's attention. Scott Blanks, Senior Director of Programs, and Plaintiff Erin Lauridsen met with representatives of ADP in December 2017 and described accessibility problems they and their staff had encountered using ADP's products. The meeting was attended by several product managers at ADP. During the meeting, ADP representatives told Mr. Blanks and Ms. Lauridsen that ADP would not be able to resolve their accessibility issues in the near term. The ADP representatives also were unable to provide Mr. Blanks and Ms. Lauridsen with a timeline or an estimate of when they could expect the accessibility problems to be addressed.

66.     Plaintiff Frank Welte also raised his accessibility concerns to ADP representatives, including over the phone and in an email dated January 3, 2018.

67.     On August 6, 2018, Plaintiffs' counsel sent ADP a letter on Plaintiffs' behalf identifying their attempts at addressing the accessibility issues and asking ADP to remediate its website and mobile application or enter into structured negotiations with Plaintiffs to create a remedial plan to address the problems. The parties entered into a Structured Negotiations Agreement ("SNA") in October 2018.

68.     Defendants made little progress during 16 months of negotiations and Plaintiffs sent ADP a letter on February 21, 2020, terminating structured negotiations, effective April 21, 2020.

69.     Rather than incorporating comprehensive accessible design principles by remediating the underlying code, ADP has contracted a third party that provides an after-the-fact accessibility toolbar overlay that must be activated at both the organizational and individual user levels.

70.     While some discrete features are now more accessible than they were in August 2018, many critical features of the website and app remain inaccessible for screen reader users. For example, the 2020 open enrollment process was completely inaccessible for screen reader

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  users. While sighted individuals had the benefit of independently and efficiently making their

2  benefit elections at any time of day when they were able, screen reader users were forced to

3  contact an ADP employee by phone during limited hours to complete this process. In addition,

4  basic functions like requesting or approving time off and updating emergency contact

5  information remain inaccessible.

6      71.    Despite ADP's knowledge that a piecemeal approach to resolving these barriers

7  does not result in an accessible product, Defendants have refused to take a systemic approach to

8  remedy the underlying accessibility design flaws.

9      72.    ADP acknowledged the willful and intentional nature of its continued

10  discriminatory conduct in correspondence dated May 4, 2020, after negotiations had concluded.

11  Defendants expressed that, although *some of its customers* had access to accessibility upgrades to

12  the open enrollment process in February 2020, it "made the business decision not to enable those

13  upgrades for TotalSource clients for the 2020 open enrollment period." ADP represents that it

14  possessed the technology to make a critical HR function performed on its website and

15  application—selection or modification of benefits during the 2020 open enrollment process—

16  accessible for individuals using screen readers, and deliberately chose not to do so for some of its

17  customers, including LightHouse.

18      **FIRST CAUSE OF ACTION**

19      California Civil Code § 51 (Unruh Civil Rights Act)

20      (Brought by all Plaintiffs against Defendant ADP)

21      73.    Plaintiffs incorporate by reference as though fully set forth herein the preceding

22  and subsequent paragraphs of this Complaint.

23      74.    The Unruh Civil Rights Act guarantees, *inter alia*, that persons with disabilities

24  are entitled to full and equal accommodations, advantages, facilities, privileges, and services in

25  all business establishments of any kind whatsoever within the jurisdiction of the state of

26  California. Cal. Civ. Code § 51(b).

27      75.    Defendants are business establishments covered by the Unruh Act's prohibition

28  against discrimination.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    76.    Plaintiff LightHouse is a "person aggrieved" under the Unruh Civil Rights Act as

2  it has directly experienced discrimination leading to harm.

3    77.    Defendants have discriminated and continue to discriminate against LightHouse

4  "on account of its association with" individuals with vision disabilities. (See *Rotary Club of*

5  *Duarte v. Bd. of Directors* (1986) 178 Cal.App.3d 1035, 1061, aff'd sub nom. *Bd. of Directors of*

6  *Rotary Int'l v. Rotary Club of Duarte* (1987) 481 U.S. 537.)

7    78.    Defendants intentionally discriminate against Plaintiff LightHouse by excluding

8  individuals who use assistive technology to access digital content, including a large percentage

9  of LightHouse's leadership and workforce, from equal access to its human resources services and

10  information.

11    79.    Lighthouse, as a customer that purchases WFN from ADP, does not obtain the

12  full benefit of the products and services it pays for as a result of the inaccessibility of ADP's

13  WFN application and website, which impacts a large percentage of the staff. This impact is then

14  multiplied when other Lighthouse staff have to step in to assist those who cannot directly access

15  the products and services.

16    80.    Plaintiffs Lauridsen and Welte are persons within the meaning of the Unruh Act

17  who have been denied full and equal access to ADP's services because of their disability.

18    81.    Plaintiffs Lauridsen and Welte do not obtain the full benefit of ADP's products

19  and services as a result of the inaccessibility of ADP's WFN application and website.

20    82.    Defendants intentionally discriminate against Plaintiffs Lauridsen and Welte in

21  denying them equal access to its products and services by failing to make them accessible,

22  despite repeated notice and opportunity to do so, to people who are blind and use screen readers.

23    83.    Therefore, pursuant to California Civil Code § 52, Plaintiffs are entitled to

24  declaratory and injunctive relief remedying the discrimination. Unless the Court issues injunctive

25  and declaratory relief to halt ADP's unlawful practices, Plaintiffs will continue to suffer

26  irreparable harm.

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    84.    Plaintiffs are also entitled to reasonable attorneys' fees, costs, and expenses, as

2    well as compensatory damages in an amount to be determined at trial based on actual and/or

3    statutory damages.

4    85.    WHEREFORE, Plaintiffs pray for relief as set forth below.

5    **SECOND CAUSE OF ACTION**

6    California Civil Code § 51.5

7    (Brought by Plaintiffs LightHouse, Lauridsen, and Welte against ADP)

8    86.    Plaintiffs incorporate by reference as though fully set forth herein the preceding

9    and subsequent paragraphs of this Complaint.

10   87.    Section 51.5(a) precludes business establishments from "discriminat[ing] against

11   . . . any person in this state on account of [disability] or of the person's partners, members,

12   stockholders, directors, officers, managers, superintendents, agents, employees, business

13   associates, suppliers, or customers, because the person is perceived to have [a disability.]" Cal.

14   Civ. Code § 51.5(a).

15   88.    Plaintiffs LightHouse, Lauridsen, and Welte are "persons" protected by this

16   section. *Id.* § 51.5(b) (defining "person" to include "any person, firm, association, organization,

17   partnership, business trust, corporation, limited liability company, or company").

18   89.    ADP is a business establishment covered by section 51.5.

19   90.    ADP discriminates against all Plaintiffs by excluding individuals who use

20   assistive technology to access digital content from full and equal access to its products and

21   services.

22   91.    ADP denies all Plaintiffs full and equal access to its services by intentionally

23   refusing to integrate comprehensive accessibility into the design of its website and mobile

24   application in violation of Section 51.5(a).

25   92.    Therefore, pursuant to California Civil Code § 52, Plaintiffs are entitled to

26   declaratory and injunctive relief remedying the discrimination. Unless the Court issues injunctive

27   and declaratory relief to halt ADP's unlawful practices, all Plaintiffs will continue to suffer

28   irreparable harm.

1    93.    Plaintiffs are entitled to reasonable attorneys' fees, costs and expenses, as well as

2   compensatory damages in an amount to be determined at trial based on actual and/or statutory

3   damages.

4    94.    WHEREFORE, Plaintiffs pray for relief as set forth below.

5                                **THIRD CAUSE OF ACTION**

6                            California Unfair Competition Law

7                       (Brought by Plaintiff LightHouse against ADP)

8    95.    Plaintiff LightHouse incorporates by reference as though fully set forth herein the

9   preceding and subsequent paragraphs of this Complaint.

10    96.    "Any person who engages, has engaged, or proposes to engage in unfair

11   competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code

12   § 17203.  Unfair competition is defined as "any unlawful, unfair or fraudulent business act or

13   practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by

14   Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and

15   Professions Code." Cal. Bus. & Prof. Code § 17200.

16    97.    Defendants' violation of the Unruh Act and Section 51.5 of the California Civil

17   Code is also a violation of the California Unfair Competition Law.

18    98.    Plaintiff LightHouse has suffered economic and other harms as a result of

19   Defendants' violation of California Civil Code, Sections 51 and 51.5. LightHouse has spent

20   money on ADP's product for three years without receiving the product's full value. In addition,

21   LightHouse has lost the value of staff time spent working around the inaccessibility of the

22   product it pays for.

23    99.    Plaintiff LightHouse is entitled to restitution and injunctive relief due to ADP's

24   violation of the California Unfair Competition Law.

25    100.    WHEREFORE, Plaintiff LightHouse prays for relief as set forth below.

26                                **PRAYER FOR RELIEF**

27    Based on the foregoing, Plaintiffs respectfully pray for relief as follows:

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

*LightHouse for the Blind and Visually Impaired et al. v. Automatic Data Processing, Inc. et al.*
Complaint                                                                    28

1      1.     For an order finding and declaring that ADP's acts and practices as set forth

2  herein are unlawful and unfair;

3      2.     For an order requiring that ADP comply with state law and provide full and equal

4  independent access to its website and mobile application for people who are blind and have low

5  vision and/or who use screen reader technology;

6      3.     For such other and further relief as the Court may deem just and proper to ensure

7  that LightHouse employees who are blind or have low vision are able to use ADP's products and

8  services on a basis that is full and equal to that which is available to sighted individuals;

9      4.     For an award of restitution pursuant to California Business and Professions code

10  section 17203 in the amount of the difference between what LightHouse paid for ADP's product

11  and the value it actually obtained;

12      5.     For an award of attorneys' fees, costs and expenses incurred in the filing and

13  prosecution of this action; and

14      6.     For an award of compensatory damages for violations of California Civil Code,

15  Sections 51 and 51.5 in an amount to be determined at trial.

18  DATED: September 16, 2020        Respectfully submitted,

DISABILITY RIGHTS ADVOCATES

Meredith J. Weaver
Attorneys for Plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  **VERIFICATION BY SCOTT BLANKS ON BEHALF OF PLAINTIFF LIGHTHOUSE**

2  Verification of Pleading (Code Civ. Proc., § 446)

4  I, Scott Blanks, declare:

5  I am the Senior Director of Programs for Lighthouse for the Blind and Visually Impaired
6  of San Francisco, Plaintiff in the case *Lighthouse, et al., v Automatic Data Processing,*
*Inc., et al.*

7

8  I have read the forgoing complaint and know the contents thereof.

9  The same is true of my own knowledge, except as to those matters which are therein
stated on information and belief, and, as to those matters, I believe it to be true.

10  Executed on _____9/15/2020_____, 2020, at Alameda, California.

11

12  I declare (or certify) under penalty of perjury that the foregoing is true and correct.

13

14  DocuSigned by:
*Scott Blanks*
2A69A144F61B46C...

15  (Signature of Party)

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

16
17
18
19
20
21
22
23
24
25
26
27
28

DocuSign Envelope ID: D2EFB643-748C-4A85-A    E3F821F7970

## VERIFICATION BY PLAINTIFF FRANK WELTE

Verification of Pleading (Code Civ. Proc., § 446)

I, Frank Welte, declare:

I am a Plaintiff in the case *Lighthouse, et al., v Automatic Data Processing, Inc., et al.*

I have read the forgoing complaint and know the contents thereof.

The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

Executed on ___9/11/2020_____, 2020, at Alameda, California.

I declare (or certify) under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

*Frank Welte*

D6EF7C008BC1474...

(Signature of Party)

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204
(510) 665-8644

1

**VERIFICATION BY PLAINTIFF ERIN LAURIDSEN**

2

Verification of Pleading (Code Civ. Proc., § 446)

3

I, Erin Lauridsen, declare:

4

I am a Plaintiff in the case *Lighthouse, et al., v Automatic Data Processing, Inc., et al.*

5

I have read the forgoing complaint and know the contents thereof.

6

The same is true of my own knowledge, except as to those matters which are therein

7

stated on information and belief, and, as to those matters, I believe it to be true.

8

Executed on _____9/11/2020_____, 2020, at Alameda, California.

9

I declare (or certify) under penalty of perjury that the foregoing is true and correct.

10

11

Erin Lauridsen
8173C3F9BCB14CC...

12

(Signature of Party)

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204
(510) 665-8644

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*LightHouse for the Blind and Visually Impaired et al. v. Automatic Data Processing, Inc. et al.*
Complaint

31

# EXHIBIT 2

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Automatic Data Processing, Inc., a Delaware corporation; ADP TotalSource, Inc.,
a Florida corporation; and Does 1-5

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

LightHouse for the Blind and Visually Impaired of San Francisco, a California non-profit
corporation; and Erin Lauridsen and Frank Welte, individuals

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: *(Número del Caso):* |
|---|---|
| *(El nombre y dirección de la corte es):* | CGC-20-586626 |

Superior Court of California County of San Francisco
400 McAllister St., San Francisco, CA 94102

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Meredith Weaver, Disability Rights Advocates, 2001 Center Street Fourth Floor, Berkeley, CA 94704; 510-665-8644

DATE: *October 13, 2020*          CLERK OF THE COURT  Clerk, by _____ , Deputy
*(Fecha)*                        *(Secretario)*        *(Adjunto)*

BOWMAN LIU

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Automatic Data Processing, Inc., a Delaware corporation; ADP TotalSource, Inc., a Florida corporation; and Does 1-5

   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

Page 1 of 1

| Form Adopted for Mandatory Use | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|
| Judicial Council of California | | *www.courts.ca.gov* |
| SUM-100 [Rev. July 1, 2009] | | |

For your protection and privacy, please press the Clear This Form button after you have printed the form.

[ Print this form ]   [ Save this form ]   [ Clear this form ]

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, Bar number, and address):*
Stuart Seaborn, Bar No.198590, Meredith Weaver, Bar No. 299328
Melissa Riess, Bar No. 295959, Shira Tevah, Bar No. 307106
2001 Center St., 4th Floor, Berkeley, CA 94704

TELEPHONE NO.: (510) 665-8644   FAX NO. *(Optional):* (510) 665-8511
ATTORNEY FOR *(Name):* LightHouse for the Blind. Erin Lauridsen. and Frank Welte

**NO SUMMONS ISSUED**

**FILED**

*San Francisco County Superior Court*

SEP 17 2020

CLERK OF THE COURT
BY: _Kalene Pobrio_
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco. CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Lighthouse for the Blind, et al. v. Automatic Data Processing, Inc., et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: **CGC-20-586626** |
|---|---|---|
| [x] Unlimited   [ ] Limited<br>(Amount   (Amount<br>demanded   demanded is<br>exceeds $25,000)   $25,000) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[x] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation
(Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [x] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):* 3 (California Civil Code §§ 51, 51.5; California Unfair Competition Law)
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: September 16, 2020

Meredith J. Weaver
_____(TYPE OR PRINT NAME)_____   ▶ _[signature]_
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.
Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |
|---|---|---|

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NO: 299328 | FOR COURT USE ONLY |
|---|---|---|

NAME: Meredith J. Weaver
FIRM NAME: Disability Rights Advocates
STREET ADDRESS: 2001 Center St, 4th Floor
CITY: Berkeley       STATE: CA    ZIP CODE: 94704
TELEPHONE NO: 510-665-8644     FAX NO: 510-655-8511
E-MAIL ADDRESS: mweaver@dralegal.org
ATTORNEY FOR (Name): LightHouse for the Blind, Erin Lauridsen, and Frank Welte

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

Plaintiff/Petitioner: LightHouse for the Blind, Erin Lauridsen, and Frank Welte
Defendant/Respondent: Automatic Data Processing, Inc.; and ADP TotalSource, Inc.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: CGC-20-586626 |
|---|---|

TO (insert name of party being served): Automatic Data Processing, Inc. & ADP TotalSource, Inc.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: November 10, 2020

Daniel Weinberg
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. ☒ A copy of the summons and of the complaint.
2. ☒ Other (specify): ADR Packet, Civil Case Cover Sheet, Notice to Plaintiff

**(To be completed by recipient):**

Date this form is signed: _____

_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov



## Superior Court of California, County of San Francisco
## Alternative Dispute Resolution
## Information Package



> The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial.  There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences.   In ADR, trained, impartial people decide disputes or help parties decide disputes themselves.  They can help parties resolve disputes without having to go to trial.

**WHY CHOOSE ADR?**

It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.**  A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

*\*\*Electing to participate in an ADR process does not stop the time period to respond to a complaint or cross-complaint\*\**

**WHAT ARE THE ADR OPTIONS?**

The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

**1)  MANDATORY SETTLEMENT CONFERENCES**

Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

**2) MEDIATION**

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF),** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending. Experienced professional mediators work with parties to arrive at a mutually agreeable solution. The mediators provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience  requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. BASF staff handles conflict checks and full case management. The success rate for the program is 67% and the satisfaction rate is 99%. BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

**(B) JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco  Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional  malpractice, insurance coverage,  toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program.  A preference for a specific judge may be indicated.  The court will coordinate assignment of cases for the program.  There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

**(D) COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

### 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

#### (A) JUDICIAL ARBITRATION

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

#### (B) PRIVATE ARBITRATION

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
415-551-3869
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: | |
| ATTORNEY FOR *(Name):* | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**<br>400 McAllister Street<br>San Francisco, CA 94102-4514 | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: _____ |
|---|---|
| | **DEPARTMENT 610** |

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session. Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available to those who qualify. communityboards.org

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days   ☐ 90-120 days   ☐ Other (please specify) _____

☐ **Other ADR process** (describe) _____

2) **The parties agree that the ADR Process shall be completed by (date):** _____
3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____

☐ *Additional signature(s) attached*

ADR-2  10/18     **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

| | |
|---|---|
| **DATE:** | **FEB-17-2021** |
| **TIME:** | **10:30AM** |
| **PLACE:** | **Department 610** |
| | **400 McAllister Street** |
| | **San Francisco, CA  94102-3680** |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order   **without an appearance**   at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

**(SEE LOCAL RULE 4)**

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

**POS-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Stuart Seaborn, Bar No.198590, Meredith J. Weaver, Bar No. 299328<br>Melissa Riess, Bar No. 295959, Shira Tevah, Bar No. 307106<br>2001 Center St., 4th Floor, Berkeley, CA 94704<br><br>TELEPHONE NO.:  (510) 665-8644     FAX NO. *(Optional)*:  (510) 665-8511<br>E-MAIL ADDRESS *(Optional)*:  mweaver@dralegal.org<br>ATTORNEY FOR *(Name)*:  LightHouse for the Blind, Erin Lauridsen, and Frank Welte | FOR COURT USE ONLY |

| |
|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN FRANCISCO<br>STREET ADDRESS:  400 McAllister St.<br>MAILING ADDRESS:  400 McAllister St.<br>CITY AND ZIP CODE:  San Francisco, CA 94102<br>BRANCH NAME:  Civic Center Courthouse |

| | |
|---|---|
| PLAINTIFF/PETITIONER:  LightHouse for the Blind, Erin Lauridsen, and Frank Welte<br>DEFENDANT/RESPONDENT:  Automatic Data Processing, Inc.; and ADP TotalSource, Inc. | CASE NUMBER:<br>CGC-20-586626 |

| | |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. [ x ]  summons
   b. [ x ]  complaint
   c. [ x ]  Alternative Dispute Resolution (ADR) package
   d. [ x ]  Civil Case Cover Sheet *(served in complex cases only)*
   e. [  ]  cross-complaint
   f. [ x ]  other *(specify documents)*: Notice to Plaintiff, filed September 17, 2020

3. a.  Party served *(specify name of party as shown on documents served)*:
      Automatic Data Processing, Inc. & ADP TotalSource, Inc.

   b. [ x ]  Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person
      under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
      Kristina Launey, counsel for Defendants

4. Address where the party was served:
   400 Capitol Mall, Suite 2350, Sacramento, CA 95814

5. I served the party *(check proper box)*
   a. [  ]  **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to
      receive service of process for the party  (1) on *(date)*:                     (2) at *(time)*:

   b. [  ]  **by substituted service.** on *(date)*:              at *(time)*:           I left the documents listed in item 2 with or
      in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) [  ]  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business
         of the person to be served. I informed him or her of the general nature of the papers.
      (2) [  ]  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual
         place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [  ]  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing
         address of the person to be served, other than a United States Postal Service post office box. I informed
         him or her of the general nature of the papers.
      (4) [  ]  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served
         at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on
         *(date)*:              from *(city)*:              **or** [  ]  a declaration of mailing is attached.
      (5) [  ]  I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |

**POS-010**

| PLAINTIFF/PETITIONER: LightHouse for the Blind, Erin Lauridsen, and Frank Welte | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Automatic Data Processing, Inc.; and ADP TotalSource, Inc. | CGC-20-586626 |

5. c. [ x ] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):* November 10, 2020     (2) from *(city):* San Francisco, CA

    (3) [ x ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) [ ] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. [ ] **by other means** *(specify means of service and authorizing code section):*

    [ ] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

  a. [ ] as an individual defendant.

  b. [ ] as the person sued under the fictitious name of *(specify):*

  c. [ ] as occupant.

  d. [ x ] On behalf of *(specify):* Automatic Data Processing, Inc., a Delaware corporation; ADP Total Source, Inc., a Florida corporation; and Does 1-5
    under the following Code of Civil Procedure section:

| | | |
|---|---|---|
| [ x ] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| | [ ] other: |

7. **Person who served papers**

  a. Name: Dan Weinberg

  b. Address: 2001 Center Street, Fourth Floor, Berkeley, CA 94704

  c. Telephone number: 510-665-8644

  d. **The fee** for service was: $ 0

  e. I am:

    (1) [ x ] not a registered California process server.

    (2) [ x ] exempt from registration under Business and Professions Code section 22350(b).

    (3) [ ] a registered California process server:

      [ ] owner   [ ] employee   [ ] independent contractor.

      (ii) Registration No.:

      (iii) County:

8. [ x ] **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

  **or**

9. [ ] **I am a California sheriff or marshal** and I certify that the foregoing is true and correct.

Date: November 10, 2020

Daniel Weinberg

(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)          (SIGNATURE)

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY      STATE BAR NO: 299328<br>NAME: Meredith J. Weaver<br>FIRM NAME: Disability Rights Advocates<br>STREET ADDRESS: 2001 Center St, 4th Floor<br>CITY: Berkeley      STATE: CA      ZIP CODE: 94704<br>TELEPHONE NO: 510-665-8644      FAX NO: 510-655-8511<br>E-MAIL ADDRESS: mweaver@dralegal.org<br>ATTORNEY FOR (Name): LightHouse for the Blind, Erin Lauridsen, and Frank Welte | FOR COURT USE ONLY |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

Plaintiff/Petitioner: LightHouse for the Blind, Erin Lauridsen, and Frank Welte

Defendant/Respondent: Automatic Data Processing, Inc.; and ADP TotalSource, Inc.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-20-586626 |
|---|---|

TO (insert name of party being served): Automatic Data Processing, Inc. & ADP TotalSource, Inc.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: November 10, 2020

Daniel Weinberg
(TYPE OR PRINT NAME)

▶ _(signature)_
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. [X] A copy of the summons and of the complaint.
2. [X] Other (specify): ADR Packet, Civil Case Cover Sheet, Notice to Plaintiff

(To be completed by recipient):

Date this form is signed: November 16, 2020

Kristina M. Launey
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _(signature)_
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
Attorney for Automatic Data Processing, Inc. and ADP TotalSource, Inc.

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov |

## **PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 400 Capitol Mall, Suite 2350, Sacramento, California  95814-4428.  On November 16, 2020, I served the within document(s):

### **NOTICE AND ACKNOWLEDGMENT OF RECIEPT**

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at 400 Capitol Mall, Sacramento, California, addressed as set forth below.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at Sacramento, California, addressed as set forth below.

☒ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

Stuart Seaborn                          Attorneys for Plaintiffs
Meredith J. Weaver                   LightHouse for the Blind, Erin Lauridsen
Melissa Riess                            and Frank Welte
Shira Tevah
Disability Rights Advocates
2001 Center St., 4th Floor
Berkeley, CA  94704
Phone: (510) 665-8644
Fax: (510) 655-8511
sseaborn@dralegal.org
mweaver@dralegal.org
mriess@dralegal.org
stevah@dralegal.org

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 16, 2020, at Sacramento, California.



_____
Shelley D. Gordon

66724469v.1

# EXHIBIT 3

40 Trials Digest 21st 20, 2018 WL 4810695 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West

Superior Court, Los Angeles County, California.

## Curry v. Academy Pointe, Inc.

**TOPIC:**

Synopsis: Disabled tenant asserts Fair Employment and <mark>Housing</mark> Act claims against apartment owner and management company

Case Type: Civil Rights & Constitutional Law; Other Civil Rights

DOCKET NUMBER: BC621282

STATE: California
COUNTY: Los Angeles

**Related Court Documents:**

Defendant Statewide Enterprises' cross-complaint: 2017 WL 6408452

Judgment: 2018 WL 3192514

Defendants' motion for JNOV: 2018 WL 3128853

Plaintiff's opposition to defendants' motion for JNOV: 2018 WL 3128847

Defendants' motion for new trial: 2018 WL 3128854

Plaintiff's opposition to defendants' motion for new trial: 2018 WL 3128850

Order denying defendants' motions for JNOV and new trial: 2018 WL 3192511

Verdict/Judgment Date: February 26, 2018

JUDGE: Gregory Alarcon
**ATTORNEYS:**
Plaintiff: Daniel A. Reisman, Reisman & Reisman, Los Angeles, CA; Erin Reisman, Reisman & Reisman, Los Angeles, CA;
John J. Perlstein, Law Office of John J. Perlstein, Los Angeles, CA
Defendant: Jeffrey W. Korn, Law Office of Jeffrey W. Korn, Los Angeles, CA
Defendant (Academy Pointe and Anza Management): Joseph P. Wohrle, Law Office of Joseph P. Wohrle, Los Angeles, CA
Defendant (Statewide Enter.): Frances M. O'Meara, Thompson Coe & O'Meara L.L.P., Los Angeles, CA
Defendant (Academy Pointe, J.K. Residential Services, Anza Management Co.): Parry G. Cameron, The Cameron Law Firm,
Los Angeles, CA; Garth M. Drozin, The Cameron Law Firm, Los Angeles, CA

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $5,250,000

Range Amount: $5,000,000 - 999,999,999

$750,000 to plaintiff from defendants Academy Pointe, Anza Management Company and J.K. Residential Services for past noneconomic damages

$4,500,000 to plaintiff from defendants Academy Pointe and J.K. Residential Services for punitive damages

Trial Type: Jury

Jury Poll: Not reported

Deliberations: Not reported

**FACTS/CONTENTIONS:**
   According to court records: Plaintiff Chris Curry said he was a tenant in the Villa California Apartments located on Lankershim Boulevard in Los Angeles, California. Defendant Academy Point, Inc. reportedly owned the building and defendants Anza Management Company and Statewide Enterprises, Inc. managed it during different time periods.
   Plaintiff said he was disabled and relied on a wheelchair for mobility. Plaintiff alleged that the building's three elevators were in a constant state of disrepair. According to plaintiff, anywhere from four to nine times during a four-month period, he had to rely on his neighbors or the fire department to carry him up or down from his apartment when all three elevators were broken. During August 2015 the City of Los Angeles reportedly cited the building on two occasions when it found that none of the elevators were working.
   Plaintiff contended that he complained to defendants about the non-working elevators, but defendants failed to take action to repair them. Plaintiff reportedly suffered humiliation, mental anguish and emotional distress as a result of defendants' discrimination.
   Plaintiff sued defendants and asserted claims for (1) disability discrimination and failure to accommodate his disability under the California Fair Employment and Housing Act (FEHA), and (2) violations of the Unruh Civil Rights Act. Plaintiff sought injunctive and declaratory relief under FEHA, directing the defendants to cease their discriminatory conduct and to develop and implement a policy preventing discrimination against tenants with disabilities. He also sought awards for general and special damages, punitive damages, treble damages under Cal. Civ. Code Sec. 52(a), interest, attorneys' fees and costs.
   Defendant Statewide Enterprises brought a cross-complaint based on indemnity, contribution and declaratory relief against cross-defendant Academy Pointe, based on the parties' written property management agreement.
   Defendants Academy Pointe, J.K. Residential Services and Anza Management denied liability. Defendants argued that they repeatedly attempted to fix the elevators, but experienced issues with unreliable vendors, delays in obtaining parts and disputes with the building's previous management company. Defendants alleged that they authorized overtime to repair the elevators once they found a reliable vendor.

**CLAIMED INJURIES:**
   According to court records: Emotional distress.

**CLAIMED DAMAGES:**
   Not reported.

**SETTLEMENT DISCUSSIONS:**
Not reported.

**COMMENTS:**
According to court records: The complaint was filed May 20, 2016.

**Curry v. Academy Pointe, Inc., 40 Trials Digest 21st 20 (2018)**

Trials Digest, a Thomson Reuters/West business
JVR 1810020011

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

9 Trials Digest 11th 2, 2007 WL 4946166 (Cal.Superior) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West
Superior Court, San Francisco County, California.

# Dov vs. Ascot Hotel LLC

**TOPIC:**
Synopsis: Disabled tenant claims need for cat required reasonable accomodation

Case Type: Civil Rights & Constitutional Law; Discrimination; Landlord/Tenant; Other; Landlord/Tenant; Lease-Residential; Intentional Torts; Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Unfair Competition & Business Practices; Other

DOCKET NUMBER: CGC06452913

STATE: California
COUNTY: San Francisco
Verdict/Judgment Date: May 22, 2007.

JUDGE: Everett A. Hewlett Jr.
**ATTORNEYS:**
Plaintiff: Francisco A. Gutierrez, Law Offices of Michael C. Hall, San Francisco; Michael C. Hall, Law Offices of Michael C. Hall, San Francisco.
Defendant: David G. Mendez, Law Offices of David G. Mendez, San Francisco.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $151,200

Range: $100,000-199,999
$50,400 compensatory damages, trebled pursuant to Civil Code § 52(a) plus $26,987 attorney fees. The court also ordered injunctive relief pursuant to Business and Professions Code § 17200 and § 17203, prohibiting defendant from engaging in further unlawful business practices that discriminate against prospective tenants based on their ==disability== or refusing a reasonable request of accommodation.

Trial Type: Bench

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: Plaintiff Robert Dov had a mental **disability** that limited his ability to work and care for himself. Plaintiff owned a 16-year-old neutered male cat, "Baki." Baki's companionship alleviated plaintiff's mental **disability**, making his anxiety and depression less severe.

In the summer of 2004, plaintiff received case management from Andrew Reynolds at the Haight Ashbury Free Clinic. In June 2004, plaintiff was facing an eviction action and was in need of **housing** with low rent to accommodate his fixed income. Reynolds arranged for plaintiff to live at defendant Ascot Hotel LLC by contacting defendant and arranging for tenancy beginning on July 1, 2004.

On July 1, 2004, plaintiff and Reynolds arrived at defendant's hotel to execute a lease. Plaintiff said he informed the hotel manager of his **disability** and asked that Baki be allowed to reside with him. Plaintiff and Reynolds were told that plaintiff would not be allowed to keep Baki under defendant's "no pets" policy. Plaintiff claimed he presented the manager with a letter written by his healthcare provider documenting plaintiff's **disability** and Baki's service to plaintiff as a companion animal. The manager denied plaintiff's request.

After defendant denied plaintiff **housing**, plaintiff was unable to find **housing** during the following eight months and lived on the street for approximately four days.

Plaintiff alleged he was unlawfully denied **housing** because of his **disability**. Plaintiff also alleged violation of the **Unruh** Act, intentional and negligent infliction of emotional distress, and unfair business practices.

Defendant cross-claimed against plaintiff and alleged fraud, and misrepresentation.

## CLAIMED INJURIES

According to court records:
Emotional distress.

## CLAIMED DAMAGES

According to court records:
Not reported.

## SETTLEMENT DISCUSSIONS

According to court records:

Not reported.

## COMMENTS

According to court records:

The complaint was filed on June 6, 2006.

Trials Digest, A Thomson/West business
San Francisco County Superior Court

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

27 Trials Digest 14th 10, 2010 WL 6806990 (C.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West

United States District Court, C.D. California, Western Division.

# Peacock vs. Quest Diagnostics

**TOPIC:**

Synopsis: Employee alleges discriminatory termination in violation of CFRA

Case Type: Labor & Employment; Discrimination; Labor & Employment; Termination/Constructive Discharge; Labor & Employment; Violation of Public Policy; Labor & Employment; Family & Medical Leave; Labor & Employment; Disability/Medical Condition; Labor & Employment; Retaliation

DOCKET NUMBER: 09CV09206(JHN)

STATE: California
COUNTY: Not Applicable

Verdict/Judgment Date: December 15, 2010

JUDGE: Jacqueline H. Nguyen

**ATTORNEYS:**

Plaintiff: Christopher B. Adamson, Lavi & Ebrahimian, Los Angeles; Joseph Lavi, Lavi & Ebrahimian, Los Angeles.
Defendant: Deanna L. Ballesteros, Epstein, Becker & Green, Los Angeles; David Jacobs, Epstein, Becker & Green, Los Angeles.

**SUMMARY:**

Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $229,638

Range: $200,000-499,999
$71,138 past economic; $8,500 future economic; $150,000 past non-economic.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**

Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: Plaintiff Janeen A. Peacock was an employee of defendant Quest Diagnostics, working as a Specimen Tech II from February 2003 until approximately January 16, 2008, when she was wrongfully terminated. In the later part of 2007, plaintiff's Manager and/or Supervisor, Raymond Candeleria, started causing plaintiff severe emotional distress and depression, which manifested itself in panic attacks which were witnessed by Candeleria. Plaintiff informed Candeleria that she had been under a lot of stress at work and that was the reason for her panic attacks, which, over the months, started to increase in frequency and/or duration.

In early January 2008, plaintiff had an outburst at work in front of Candeleria. Plaintiff started crying uncontrollably in front of Candeleria and told him that her outburst was due to severe distress at work.

On January 16, 2008, plaintiff checked herself into Northridge Hospital's Emergency Room due to severe depression. On January 17, 2008, plaintiff informed defendant's Human Resources that she had been admitted into hospital for severe depression and that she had been taken off work. Plaintiff was released on January 21, 2008 and was placed on disability by her treating physician until February 5, 2008. Upon release from the hospital, plaintiff informed defendant of her disability and mailed a copy of her doctor's note placing her off work and on disability.

On January 22, 2008, plaintiff contacted defendant's Benefit Department and informed them that she had to receive psychological treatment and group therapy from January 22, 2008 to February 1, 2008. She was informed that that was okay and that defendant would follow up with plaintiff in a few days.

On February 1, 2008, plaintiff was informed by her treating physician that her insurance had been canceled. Plaintiff contacted Human Resources to find out why and was told that they did not know why.

On February 1, 2008, plaintiff received a letter dated January 31, 2008, stating that defendant had terminated plaintiff's employment for job abandonment.

Plaintiff filed suit for Discriminatory Termination in Violation of the California Family Rights Act, California Government Code § 12945.2; Violation of the California Family Rights Act, California Government Code § 12945.2(a), Interfering with the Rights and Refusing an Employee's Request for a CFRA Medical Leave; Retaliatory Termination in Violation of the California Family Rights Act, California Government Code § 12945.2, for Requesting and Going on a Medical Leave; Tortious Termination and Discrimination in Violation of Public Policy; Disability Discrimination in Violation of FEHA; Discrimination Based on Perceived Disability in Violation of FEHA; Disability Discrimination in Violation of FEHA, Failure to Provide Reasonable Accommodation; Disability Discrimination in Violation of FEHA, Failure to Engage in Interactive Process; Retaliatory Termination in Violation of FEHA for Requesting a Reasonable Accommodation; Tortious Termination and Discrimination in Violation of Public Policy Based on FEHA; and Tortious Termination, Discrimination, and Failure to Hire in Violation of Public Policy for the Right to File a Workers' Compensation Claim due to Work Related Injury.

## CLAIMED INJURIES
NA

## CLAIMED DAMAGES
According to court records:
Not reported.

## SETTLEMENT DISCUSSIONS
According to court records:

Not reported.

## COMMENTS
According to court records:

The complaint was filed on October 29, 2009.

**Peacock vs. Quest Diagnostics, 27 Trials Digest 14th 10 (2010)**

Trials Digest, A Thomson Reuters/West business
Central District Federal Court/Los Angeles

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 1910040037, 2019 WL 4918279 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West

Superior Court, San Bernardino County, California.

# SPAULDING v. SHANNON DIVERSIFIED INC.; M. SHANNON; C. SHANNON; ECO ABSORBENT TECHNOLOGIES INC.

CIVDS-16-09525

DATE OF INCIDENT: November 15, 2013
DATE OF FILING: June 16, 2016
DATE OF TRIAL/SETTLEMENT: April 25, 2019

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total: $138,762**

**Related Court Documents:**
Plaintiff's second amended complaint: 2018 WL 9686566

Defendants' trial brief: 2019 WL 4695071

Plaintiff's trial brief: 2019 WL 4695069

Verdict form: 2019 WL 4695462

Judgment: 2019 WL 4737915

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff:
Geniene B. Stillwell, Stillwell Law Office P.C., Laguna Beach, CA
Freda Tjoarman, Stillwell Law Office P.C., Laguna Beach, CA
Defendant:
Robert A. Hufnagel, Wait & Hufnagel, Clarmont, CA
Thomas B. Wait, Wait & Hufnagel, Claremont, CA
JUDGE: Thomas S. Garza

RANGE AMOUNT: $100,000 - 199,999

STATE: California
COUNTY: San Bernardino

**SUMMARY**
**PLAINTIFF:**
Sex: M

Age: Adult

**DEFENDANT:**

SPAULDING v. SHANNON DIVERSIFIED INC.; M...., JVR No. 1910040037...

Sex: O

Organization Type: Shannon Diversified Inc.

Sex: M

Age: Adult

Organization Type: Shannon

Sex: F

Age: Adult

Organization Type: Shannon

Sex: O

Organization Type: Eco Absorbent Technologies Inc.

**DAMAGES:**
Compensatory Pain & Suffering: $56,881

Compensatory Past Wages: $56,881

Total Compensatory Award: $113,762

Punitive Damages: $25,000

**ADVERSE ACTION**
Closer Supervision: false

Constructive Discharge: false

Demotion: false

Denial Tenure: false

Failure Accomodate: true

Failure Grant Leave: false

Failure Hire: false

Failure Promote: false

Suspension: false

Sexual Harassment: false

Harassment: false

Hostile Work Env: false

Isolation: false

Lay Off: false

Loss Benefits: false

Loss Pay: false

Loss Seniority: false

Negative Eval: false

Negative Reference: false

Pay Increase Denial: false

Reassignment: false

Reduction Pay: false

Reprimands: false

Restrictions: false

Termination: true

**Entity Type: General Business Entity**
**STATUTES**
**Primary Specific Statute**
Primary Name: State

**Primary General Statute**
**Primary Name: Disability Discrimination**
Primary General Statute Discrimination: true

Specific Statute: General

**General Statute: Retaliation**
General Statute Discrimination: false

Specific Statute: General

**General Statute: Wrongful Termination**
General Statute Discrimination: false

Comparative Negligence Percentage: 0

**FACTS:**

Edward Spaulding sued Shannon Diversified Inc., Michael Shannon, Christina Shannon and Eco Absorbent Technologies Inc. for disability discrimination and related claims. The plaintiff said he was hired by Shannon Diversified as a Business Development Manager and that a few months into the job, he suffered an injury to his shoulder while performing an inspection for the company. A doctor reportedly released him to return to work the same day with some restrictions that the plaintiff claimed would not affect his ability to perform his main business development duties. His employment was terminated later that evening, purportedly because of his rude behavior and attitude. The plaintiff alleged Michael and Christina Shannon were executives and owners of Shannon Diversified and Eco Absorbent Technologies Inc., and he claimed that they were alter egos of Shannon Diversified. He further contended that Eco Absorbent was a joint enterprise of Shannon Diversified and the joint employer of the plaintiff. He brought causes of action against the defendants for wrongful discharge in violation of public policy, retaliation in violation of the Fair Employment and Housing Act (FEHA), disability discrimination in violation of FEHA, failure to reasonably accommodate in violation of FEHA, and failure to engage in the interactive process in violation of FEHA. The defendants denied liability. They contended the plaintiff was an independent contractor who developed no meaningful business during his tenure and that he was terminated due to his unprofessional behavior. Defendants Shannon denied alter ego liability, and defendant Eco Absorbent denied that it was an employer of the plaintiff. The jury found in favor of the plaintiff and against Shannon Diversified Inc. only on all causes of action, as Eco Absorbent was found to not be an employer of the plaintiff.

Jury Verdict Research
COURT: Superior

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

TOTH v. BARSTOW UNIFIED SCHOOL DISTRICT, JVR No. 1505270035 (2014)

JVR No. 1505270035, 2014 WL 9859298 (C.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West
United States District Court, C.D. California.

TOTH v. BARSTOW UNIFIED SCHOOL DISTRICT

5:12CV02217

DATE OF FILING: December 14, 2012
DATE OF TRIAL/SETTLEMENT: December 22, 2014

**SUMMARY**
**Outcome: Plaintiff Judgment**
**Total: $289,244**
HIGH AMOUNT: $0

LOW AMOUNT: $0

Appeal Filed By: For The Defendant

Name of Party: Barstow Unified School District

**Related Court Documents:**
Plaintiff's trial brief: 2014 WL 8240110

Defendant's trial brief: 2014 WL 8240091

Amended judgment: 2014 WL 8240467

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Surisa E. Rivers, Rivers Law Office, Los Angeles, CA
Plaintiff: Shawna L. Parks, Law Office of Shawna L. Parks, Los Angeles, CA
Defendant: Sarah L. Overton, Cummings, McClorey, Davis & Acho P.L.C., Riverside, CA
Defendant: Maurice S. Kane, Cummings, McClorey, Davis & Acho P.L.C., Riverside, CA
JUDGE: Terry J. Hatter

RANGE AMOUNT: $200,000 - 499,999

STATE: California
COUNTY: Not Applicable
Defendant Admitted Liability: Yes

**SUMMARY**
**PLAINTIFF:**
Sex: M

Age: Adult, 64

General Occupation: Psychologist

**DEFENDANT:**
Sex: O

Organization Type: Barstow Unified School District

**DAMAGES:**
Compensatory Pain & Suffering: $75,000

Compensatory Past Wages: $119,048

Compensatory Future Wages: $95,196

Total Compensatory Award: $289,244

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Interest: $0

Other Damages: $0

Loss of Services: $0

**ADVERSE ACTION**
Closer Supervision: false

Constructive Discharge: true

Demotion: false

Denial Tenure: false

Failure Accomodate: true

Failure Grant Leave: false

Failure Hire: false

Failure Promote: false

Suspension: false

Sexual Harassment: false

Harassment: true

Hostile Work Env: false

Isolation: false

Lay Off: false

Loss Benefits: true

Loss Pay: true

Loss Seniority: false

Negative Eval: false

Negative Reference: false

Pay Increase Denial: false

Reassignment: false

Reduction Pay: false

Reprimands: true

Restrictions: false

Termination: false

**Entity Type: Public Educational Institution**
**STATUTES**
**Primary Specific Statute**
Primary Name: ADA/ADAAA

**Primary General Statute**
**Primary Name: Disability Discrimination**
Primary General Statute Discrimination: true

Specific Statute: General

**General Statute: Rehabilitation Act of 1973**
General Statute Discrimination: false

Specific Statute: General

**General Statute: Wrongful Termination**
General Statute Discrimination: false

Comparative Negligence Percentage: 0

**FACTS:**

TOTH v. BARSTOW UNIFIED SCHOOL DISTRICT, JVR No. 1505270035 (2014)

Gordon Toth, a former school psychologist, sued Barstow Unified School District (BUSD) for disability discrimination and harassment, failure to provide a reasonable accommodation under federal and California law, constructive discharge, and failure to prevent discrimination and harassment. The 64-year-old former school psychologist contended he developed various physical disabilities during his employment with BUSD, including severe carpal tunnel syndrome, which was hereditary, and arthritis as well as neuropathy, which were related to his diabetes. He contended during the first 20 years of his employment, BUSD provided administrative staff to help with typing the lengthy reports that he and other school psychologists were required to prepare. Toth asserted he eventually learned that BUSD planned to cut administrative staff who assisted with the typing, so he informed BUSD that he could not type due to his disabilities and requested continued assistance. The plaintiff alleged the defendant cut off the typing assistance, and ignored his requests for reasonable accommodation for several months until finally it presented him with a voice-recognition typing software program. However, Toth alleged that he was given an incorrect version of the software which did not work properly with his computer, and ultimately this resulted in even longer preparation time for his reports. He contended after months of reporting problems with the software, the defendant briefly provided typing assistance from a BUSD clerical employee, but required that the typing be done after normal work hours, and at the discretion of the clerical employee, but this assistance was abruptly taken away without any notice or explanation. Toth asserted he was finally given the appropriate version of the voice-recognition typing software, but was not provided sufficient training or technical support for its use, and that the defendant's failure to provide reasonable accommodation caused him to fall far behind on his reports. He also claimed during this time, his supervisor wrote him up numerous times for unfinished reports, accused him of not trying hard enough, and humiliated him in front of his colleagues for being unable to complete his reports. He argued that as a result of the failure to provide a reasonable accommodation and the harassment by his supervisor, he developed high blood pressure and major anxiety, which exacerbated his carpal tunnel and arthritis symptoms. According to Toth, he was forced to take medical leave, and then reluctantly filed for an early retirement because he was unable to return to work under the existing circumstances. The defendant denied liability and contended Toth was not discharged, but instead voluntarily resigned, that BUSD provided reasonable and timely accommodations to Toth, and that there was no evidence of harassment because of his disability, or failure to take all measures to prevent discrimination and harassment. The defendant further contended the plaintiff was not entitled to any damages because of a prior settlement with BUSD before the Workers Compensation Appeals Board, which precluded him from pursuing any further litigation or damages against BUSD. Furthermore, BUSD asserted that Toth was physically and emotionally unable to work following his resignation, and he failed to mitigate damages. The court granted summary judgment on the plaintiff's claims under the Americans with Disabilities Act for failure to provide a reasonable accommodation, Section 504 of the Rehabilitation Act for failure to provide a reasonable accommodation, the Fair Employment and Housing Act (FEHA) for failure to make a reasonable accommodation, and for failure to engage in an interactive process to determine an effective reasonable accommodation. The court also granted summary judgment on the plaintiff's claims under the FEHA for constructive discharge, discrimination and harassment, and failure to take all reasonable steps to prevent the discrimination and harassment. Following the determination of the defendant's liability on all causes of action, a bench trial was held on the remaining issue of damages, and Toth was awarded $289,244. The Court later ordered the defendant to pay Toth $5,362 in costs. Barstow has filed an appeal.

Jury Verdict Research
COURT: USDC

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

6 Trials Digest 14th 5, 2010 WL 5659023 (N.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West
United States District Court, N.D. California.

# Potter vs. CVS Pharmacy Inc.

**TOPIC:**

Synopsis: CVS customer finds disabled access inadequate

Case Type: Civil Rights & Constitutional Law; Americans with Disabilities Act; Civil Rights & Constitutional Law; Discrimination

DOCKET NUMBER: 09CV04786(MEJ)

STATE: California
COUNTY: Not Applicable

Verdict/Judgment Date: August 17, 2010

JUDGE: Maria Elena James

**ATTORNEYS:**

Plaintiff: Celia McGuiness, Law Offices of Paul L. Rein, Oakland; Paul L. Rein, Law Offices of Paul L. Rein, Oakland.
Defendant: Robert L. Duston, Saul Ewing, Washington, DC; Henry A. Platt, Saul Ewing, Washington, DC; Edward J. Rodzewich, Valerian, Patterson, Stratman & Love, Alameda; David I. Strong, Branson, Brinkop, Griffith & Strong, Redwood City.

**SUMMARY:**

Verdict/Judgment: Settlement

Verdict/Judgment Amount: $89,000

Range: $50,000-99,999

Defendants CVS Pharmacy Inc, Procare Pharmacy LLC, and Berkeley Medical Center agreed to pay plaintiff $89,000.

Trial Type: Settlement

**EXPERTS:**

Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: On February 14, 2009, plaintiff Steve Potter went to the Care Plus CVS/Pharmacy at 3031 Telegraph Avenue in Berkeley, California to fill a prescription for pain medication. He traveled there in his motorized wheelchair. Approaching the pharmacy's main entrance on Telegraph, he found that his entry was blocked by four stairs, which he could not ascend in his wheelchair.

When plaintiff went around the corner of the building, he found the Webster Street entrance was locked and a sign advising patrons to use the Telegraph Avenue entrance. Plaintiff continued along the walkway on Webster but found the walkway ended with a six-inch drop-off curb. On the other side of the building, along Telegraph and back toward the parking lot, wheelchair passage was blocked by a metal post in the walkway and an excessively narrow path of travel with an excessively steep side slope. With all entryways blocked, plaintiff left without his medication.

Plaintiff also claimed defendants CVS Pharmacy Inc., Pharmacare US Inc. dba Care Plus CVS/Pharmacy, Procare Pharmacy LLC, and Berkeley Medical Center's parking lot was not properly accessible by not having properly signed, configured, and designated disabled-accessible and van-accessible parking spaces, or in sufficient numbers and with proper paths of travel to any of the building's entrances.

Plaintiff alleged denial of civil rights and access to public facilities to physically disabled persons and violation of the Unruh Civil Rights and Americans with Disabilities acts.

**CLAIMED INJURIES**
According to court records:
Emotional distress.

**CLAIMED DAMAGES**
According to court records:
Not reported.

**SETTLEMENT DISCUSSIONS**
According to court records:

Not reported.

**COMMENTS**
According to court records:

The complaint was filed on October 7, 2009.

Henry A. Platt and Robert L. Duston represented defendants CVS Pharmacy Inc. and Procare Pharmacy LLC. David I. Strong and Edward J. Rodzewich represented defendant Berkeley Medical Center.

Trials Digest, A Thomson Reuters/West business
Northern District Federal Court/San Francisco

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

28 Trials Digest 18th 7, 2014 WL 10098124 (N.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West
United States District Court, N.D. California.

# Dalton v. City of Oakland

**TOPIC:**
Synopsis: Oakland Fairyland parking allegedly violates ADA

Case Type: Civil Rights & Constitutional Law; Americans with Disabilities Act

DOCKET NUMBER: 3:13CV00497

STATE: California
COUNTY: Not Applicable

**Related Court Documents:**
Plaintiff's verified complaint: 2013 WL 10800604

Verdict/Judgment Date: October 07, 2014

JUDGE: Elizabeth D. Laporte
**ATTORNEYS:**
Plaintiff: Paul L. Rein, Law Offices of Paul L. Rein, Oakland, CA; Celia McGuinness, Law Offices of Paul L. Rein, Oakland, CA; Catherine M. Cabalo, Law Offices of Paul L. Rein, Oakland, CA
Defendant: Arlene Marcia Rosen, Office of the City Attorney, Oakland, CA

**SUMMARY:**
Verdict/Judgment: Settlement

Verdict/Judgment Amount: $95,000

Range Amount: $50,000 - 99,999
$95,000 to plaintiff for damages

The city also agreed to perform injunctive relief to improve disabled access at Lakeside Park.

Trial Type: Settlement

**FACTS/CONTENTIONS:**
According to court records: Plaintiff John Dalton was a disabled person, a quadruple amputee, who required the use of a wheelchair for mobility. Defendant City of Oakland owed Lakeside Park near Lake Merritt in Oakland, California, and plaintiff claimed defendant failed to provide persons with mobility impairments with accessibility features required under state law. Specifically, plaintiff claimed, the disabled parking spaces adjacent to 'Fairyland' had no unloading zones, were improperly configured, had no curb cuts and had no accessible paths of travel to the Fairyland entrance.
Plaintiff said the lack of appropriate disabled parking exposed him and his daughter to the danger of being hit by a car traveling in the traffic lane in the street or backing out of other spaces and said the lack of appropriate disabled parking discouraged him from attempting to use the area again as frequently as he would otherwise.

Plaintiff alleged discrimination in violation of Title II of the Americans With Disabilities Act, violation of Section 504 of the Rehabilitation Act of 1973, violation of the Unruh Act and other California civil codes, and violation of Cal. Gov't Code Sec. 11135.

Defendant agreed to settle plaintiff's claims.

**CLAIMED DAMAGES:**

Not reported.

**SETTLEMENT DISCUSSIONS:**

Not reported.

**COMMENTS:**

According to court records: The complaint was filed Feb. 5, 2013.

Trials Digest, a Thomson Reuters/West business
JVR 1507100030

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

JVR No. 494036, 1000 WL 120714 (C.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West

United States District Court, C.D. California.

## HOVING v. SAN LUIS OBISPO COUNTY; HEDGES; BOLTS

2:07-cv-06853-GW-CT

DATE OF SETTLEMENT: September, 2008

TOPIC:

LIABILITY:

General: COUNTY GOVERNMENT

Specific: Civil Rights Violation

**SUMMARY**
**Outcome: Settlement**
**Non Verdict Award: $660,000**
**Total Verdict:**
**Judge Reduced Award To:**
**Claimed Past Medical:**
**Claimed Future Medical:**
**Claimed Past Wage Expense:**
**Claimed Future Wage Expense:**
Plaintiff's Economist:

Defendant's Economist:

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Michael P. Stone, Pasadena, CA
Defendant: Patrick A. Long, Santa Ana, CA
JUDGE: George H. Wu

RANGE AMOUNT: $500,000 - 999,999

STATE: California
COUNTY: Not Applicable

**PRIMARY INJURY: Civil Rights Violation**

**SUMMARY**
**SETTLEMENT TIME: After Filing**
**PLAINTIFF:**
Sex: Male

Age: 54

General Occupation: POLICE OFFICER

**DECEDENT:**
Funeral Expense:

Other Expenses:

**DEFENDANT:**
Type: Individual / Organization

Sex: Organization

Organization Type: PUBLIC ADMN.-EXECUTIVE, LEGISLATIVE AND GENERAL

Policy Limit:

**DAMAGES:**
Past Medical:

Future Medical:

Past Wage:

Future Wage:

Pain and Suffering:

Other: $660,000

Total: $660,000

Punitive:

Hedonic:

Property:

Other:

Interest:

Loss of Services:

**FACTS:**
A 54-year-old male sheriff's deputy alleged that he suffered emotional distress after his work office was videotaped by the male co- and third-named defendant sheriffs during a private meeting with a nonparty deputy sheriff, in the course and scope of their employment with the defendant. The plaintiff contended that the defendant county failed to properly train and supervise its employees. The plaintiff further contended that the co- and third-named defendants deliberately violated his civil rights, invaded his privacy, and recorded him and the nonparty deputy without their consent. The defendants denied liability

and contended that the recording was made for legitimate and permissable reasons while investigating the possibility of criminal activities.

Jury Verdict Research
COURT:

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 485001, 2000 WL 35641831 (Unknown State Ct. (Cal.)) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West
Unknown California State Ct.

# BOLLER v. PLACER UNION HIGH SCHOOL DISCTRICT; MILLER; CANNEDY; O'BRIEN; LANTZ

N/A

DATE OF INCIDENT: April, 1998
DATE OF TRIAL: April, 2000

TOPIC:

LIABILITY:

General: EMPLOYER NEGLIGENCE

Specific: Public Servant

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Non Verdict Award:**
**Total Verdict: $158,575**
**Judge Reduced Award To:**
**Claimed Past Medical:**
**Claimed Future Medical:**
**Claimed Past Wage Expense:**
**Claimed Future Wage Expense:**
Plaintiff's Economist:

Defendant's Economist:

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Roy E. Harper, Nevada City, CA
Defendant: Dennis P. McPherson, Gold River, CA
JUDGE: Frances A. Kearney

RANGE AMOUNT: $100,000-199,999

STATE: California
COUNTY: Placer

**PRIMARY INJURY: Civil Rights Violation**

**SUMMARY**
**PLAINTIFF:**
Sex: Female

Age: 58

General Occupation: GENERAL LABORER

**DECEDENT:**
Funeral Expense:

Other Expenses:

**DEFENDANT:**
Type: Individual / Organization

Sex: Organization

Policy Limit:

**DAMAGES:**
Past Medical:

Future Medical:

Past Wage:

Future Wage:

Pain and Suffering: $158,575

Other:

Total: $158,575

Punitive:

Hedonic:

Property:

Other:

Interest:

Loss of Services:

**FACTS:**
A 58-year-old female cafeteria worker alleged that she suffered emotional distress when she was strip searched after she was accused of stealing money from a vending machine at the defendant school district where she was employed. At the time of this accident the strip search was performed by the male codefendant and supervised by the remaining defendants. The plaintiff contended that the defendant failed to properly train and supervise its employees, and violated her civil rights. The plaintiff further contended that the remaining defendants negligently performed a strip search on the plaintiff without probable cause, violated her civil rights, and invaded her privacy. The defendants denied liability and contended that the

plaintiff gave her consent for the search.

Jury Verdict Research
COURT:

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

34 Trials Digest 3d 11, 2000 WL 1591282 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West

Superior Court, San Diego County, California.

## Zamora vs. Escondido Union School District

**TOPIC:**

Synopsis: Public education employee claims disclosure of felony to third party was invasion of privacy

Case Type: Invasion of Privacy

DOCKET NUMBER: N81401

STATE: California
COUNTY: San Diego

Verdict/Judgment Date: May 23, 2000

JUDGE: Lisa Guy-Schall

**ATTORNEYS:**

Plaintiff: David J. Strauss, Strauss & Asher, San Diego.

Defendant: Randell L. Winet, Winet, Patrick & Weaver, Vista.

**SUMMARY:**

Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $247,500

Range: $200,000-$499,999

$240,000 awarded for invasion of right to privacy and $15,000 awarded on the negligence claim (the negligence claim was reduced by 50 percent comparative liability).

Trial Type: Jury

Trial Length: 1 week.

Deliberations: 7.5 hours.

Jury Poll: 12-0 negligence; 12-0 privacy.

**EXPERTS:**

Plaintiff: Robert H. Wallace CPA, economist, Brodshatzer, Wallace, Spoon & Yip, San Diego, (619) 234-4173.

Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to Plaintiff: Plaintiff claimed an invasion of privacy with respect to defendant superintendent's disclosure of plaintiff's felony conviction to a third party. The plaintiff was William Zamora. The defendants were Escondido Union School District and Nicolas Retana.

Plaintiff claimed that he was induced to leave a 25-year career in public education in Albuquerque to work in Escondido Union School District (EUSD) in an administrative position. After indicating that plaintiff could not start until after a fingerprint and background check, defendants allowed plaintiff to quit his job in New Mexico. Plaintiff moved to Escondido and commenced employment before EUSD received results from the FBI, which arrived five months after he had started his employment. The FBI revealed a 1963 felony conviction when plaintiff was a juvenile and for which he had received pardon in 1972. Such a conviction rendered him ineligible for employment in California schools, regardless of pardon. In the aftermath of the discovery of the felony conviction, defendant superintendent breached the confidentiality of information by sharing the information with a school board member back in Albuquerque who, in turn, shared the information with the director of personnel in Albuquerque. Plaintiff thereafter was turned down for five jobs he attempted to obtain in the school district where he had been employed for 25 years.

Plaintiff alleged that the EUSD negligently allowed plaintiff to quit his existing job in Albuquerque because of an immediate need of plaintiff to fill the administrative position. Plaintiff had advised defendant superintendent of the felony conviction obtained when he was a minor and a subsequent governor's pardon. Plaintiff did not accurately fill out his employment application, which asked for prior felony convictions, because he believed that the pardon expunged the felony. EUSD advised plaintiff that he could not commence employment until he successfully completed the background check to be conducted by EUSD. Plaintiff also alleged that he resigned the position in reliance on assurances that he was cleared to commence his employment in Escondido. The FBI background check was completed five months after he started and plaintiff was forced to resign. Had EUSD properly conducted the background check, plaintiff would not have resigned his employment in Albuquerque. Plaintiff also alleged that his privacy was violated by the Escondido superintendent advising former colleagues of the confidential results of the FBI background check and other circumstances of plaintiff's forced resignation.

Defendants contended that plaintiff never told the superintendent of the felony conviction and by failing to indicate on his employment application that he had a prior felony conviction, he was solely responsible for having resigned his position in Albuquerque since administrators in Escondido would have immediately flagged him as ineligible to be employed. Defendants also contended that no violation of right to privacy occurred in the superintendent's communication because the Albuquerque school board member was an interested person who had been listed as a reference on plaintiff's application for employment and because conviction information was a public record.

## CLAIMED INJURIES

NA

## CLAIMED DAMAGES

According to Plaintiff: $406,000 past and future income.

## SETTLEMENT DISCUSSIONS

According to Plaintiff: Demand: $400,000 before trial. Offer: None.

Trials Digest, A Thomson/West business
San Diego County Superior Court/Central

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

40 Trials Digest 7th 6, 2004 WL 2258120 (N.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West
United States District Court, N.D. California.

# Tran vs. Lehrer Management Company, Inc.

**TOPIC:**
Synopsis: SETTLEMENT--Plaintiff's employer installs tracking device on her computer without her knowledge

Case Type: Invasion of Privacy

DOCKET NUMBER: C033601JF

STATE: California
COUNTY: Not Applicable
                                     Verdict/Judgment Date: May 2004

JUDGE: Jeremy Fogel
**ATTORNEYS:**
Plaintiff: William F. Taylor, Law Offices of William F. Taylor, Berkeley.
Defendant: Susan Kabanek, Sims & Layton, San Jose.

**SUMMARY:**
Verdict/Judgment: Settlement

Verdict/Judgment Amount: $100,000

Range: $100,000-$199,999
After a one-day mediation using the services of Thomas H.R. Denver, Esq., defendant agreed to pay $100,000 in exchange for a release and dismissal.

Trial Type: Not Applicable

Trial Length: Not Applicable

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**
According to Plaintiff: An employee sued her employer after it installed a program to track her computer use without her knowledge. The plaintiff was Diane Tran, an administrative assistant for defendant Lehrer Management Company Inc., a financial company in Cupertino. Plaintiff's work involved use of a desktop personal computer. Defendant's written company policies did not prohibit personal use of office computers and apparently allowed some personal use. Plaintiff

used the computer for personal purposes, including private e-mails through her private Yahoo e-mail account and electronic AOL Instant Messaging.

In August 2002, defendant installed a program called 'eBlaster' on plaintiff's desktop office computer. EBlaster captures every keystroke of the computer on which it is installed, formats the data into a standard report form, and forwards the captured data to an e-mail address designated by the installer.

Plaintiff alleged that eBlaster was installed without her knowledge. She further alleged that she learned of the installation only because defendant mistakenly programmed eBlaster to forward its results to a wrong e-mail address. The stranger who received the eBlaster reports called plaintiff to alert her. Plaintiff alleged that defendant intercepted and recorded at least 31 private electronic communications, including an AOL instant message conversation and e-mail communications with her bank and credit card lenders, before she learned of eBlaster's installation. Plaintiff later voluntarily resigned from defendant to take a better job with a different employer.

Plaintiff then sued in District Court, seeking statutory damages under federal and state statutes, attorney fees under federal statutes, and exemplary damages. Plaintiff set forth five claims: Interceptions of Electronic Communications in Violation of United States Code, Title 18, § 2511; Disclosures of Electronic Communications in Violation of United States Code, Title 18, § 2511; Reading or Attempting to Learn Contents of Communications in Violation of California Penal Code § 631; Recording Confidential Communications in Violation of California Penal Code § 632; and Invasions of Privacy in Violation of California Constitution, Article 1, § 1 and California Common Law.

Defendant admitted eBlaster's interception, but contended, inter alia, that plaintiff had consented to the installation and had suffered no damages. The parties served and responded to written discovery.

**CLAIMED INJURIES**
N/A

**CLAIMED DAMAGES**
According to Plaintiff: Not reported.

**SETTLEMENT DISCUSSIONS**
According to Plaintiff: Not reported.

Trials Digest, A Thomson/West business
Northern District Federal Court/San Jose

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.